ILLINI FEDERAL SAVINGS & LOAN ASSOCIATION, Plaintiff-Counterdefendant-Appellant and Cross-Appellee, *v.* ELSAH HILLS CORPORATION *et al.*, Defendants.—(David Bailey *et al.*, Intervening Counterplaintiffs-Appellees and Cross-Appellants.)

Fourth District No. 4—82—0231

Opinion filed January 26, 1983.

James H. Bandy, of Listeman, Bandy & Hamilton, of Belleville, and W. Stanley Walch and John W. Finger, both of Thompson & Mitchell, of St. Louis, Missouri, for appellant.

Claude J. Davis, of Suddes, Davis & Wittman, of Jerseyville, for appellees.

JUSTICE LEWIS delivered the opinion of the court:

This declaratory judgment action was brought in the circuit court of Jersey County for construction of restrictive covenants affecting land use in a subdivision. The trial court granted in part and denied in part summary judgment for intervening counterplaintiffs, David Bailey *et al.* (Bailey), and against plaintiff, Illini Federal Savings & Loan Association (Illini). Judgment was entered on the court's finding. Illini appeals and Bailey cross-appeals. We affirm.

In 1963, Elsah Hills Corporation had legal title to approximately 60 acres and was purchasing on contract 200 acres less the previously acquired 60 acres, all in Jersey County, Illinois. On December 30, 1963, the corporation recorded a document entitled "Subdivision Restrictions" with the county recorder. During 1963 and over the next 14 years, the corporation sold lots within the 60-acre tract to over 60 title holders. On December 2, 1977, Illini acquired (by means not appearing of record) title to the 140-acre balance as well as several lots within the 60 acres. The 140 acres is in two noncontiguous parcels and was never assigned lot lines or numbers.

On June 5, 1979, a document was recorded which purported to make changes in the original subdivision restrictions as allowed by its procedures for amendment. On May 29, 1981, Illini filed this declaratory judgment action against Elsah Hills Corporation. Illini maintained that the subdivision's restrictive covenants prohibited amendments until December 31, 1983, 20 years after their initial recording.

The trial court granted leave to intervene to a group of lot owners led by David Bailey. On July 23, 1981, they filed a countercomplaint seeking a declaration that the 1979 amendments to the restrictive covenants went into effect immediately upon their recording and that covenants in the original restrictions applying only to "lots" were equally

applicable to the two parcels making up Illini's unsubdivided 140 acres.

Defendants Elsah Hills *et al.* (Elsah Hills) moved for summary judgment against Illini on its complaint and said motion was denied. (Elsah Hills did not cross-appeal.) Bailey moved for summary judgment on his complaint. The court denied the motion as to the effective date of the amendments, but granted the motion regarding the scope of the original restrictions. Judgment was entered on that finding.

Paragraph 23 of the original "Subdivision Restrictions" provides:

"These covenants are to run with the land and shall be binding on all parties and all persons claiming under them for a period of twenty (20) years, from the date these covenants are recorded, after which time said covenants shall be automatically extended for successive periods of ten (10) years unless an instrument signed by a three-fourths (3/4) majority of the then owners of the lots has been recorded, agreeing to change said covenants in whole or in part."

Illini maintains that amendments can only be recorded after the lapse of the first 20-year period. Thus, its prayer for relief requests that the 1979 amendments be declared null and void and be expunged from the record of the Jersey County recorder's office. Bailey argues that the amendatory clause allows for amendments at any time and that they become effective immediately upon recording. We believe that neither interpretation follows the natural meaning of the language.

■ First, the interpretation by Illini is patently wrong. The provision clearly states that unless properly amended, the covenants will be automatically extended for 10 more years at the end of the 20-year period. The covenants are not amended until an instrument so doing is recorded. If no amendatory instrument was recorded prior to December 31, 1983, the original restrictions would have continued in effect for 10 more years. Using the same reasoning, a clause almost identical to the one here was also so construed in *Failla v. Meaux* (La. App. 1970), 237 So. 2d 688. We conclude that it was appropriate to record amendments any time after the recording of the original restrictions.

Bailey maintains that amendments become effective immediately upon being recorded. In order for the paragraph in question to have this meaning, the last clause "unless an instrument signed by a three-fourths (3/4) majority of the then owners of the lots has been recorded, agreeing to change said covenants in whole or in part" must be found to modify the entire sentence rather than the immediately preceding clause, "after which time said covenants shall be automatically extended for successive periods of ten (10) years." Neither rules of construction nor logic countenance such a result.

■ According to the "last antecedent clause" rule of construction, a qualifying phrase is to be confined to the last antecedent unless there is something in the instrument requiring a different construction. (*Zimmerman v. Willard* (1885), 114 Ill. 364, 2 N.E. 70; *Storybook Homes, Inc. v. Carlson* (1974), 19 Ill. App. 3d 579, 312 N.E.2d 27; *Tondre v. Pontiac School District No. 105* (1975), 33 Ill. App. 3d 838, 342 N.E.2d 290.) Not only is there nothing in the instrument requiring a different construction, if the restrictions can be amended at any time, the 20-year and successive 10-year time periods would be rendered meaningless. Meaning and effect must be given each part of an instrument and it is presumed that each provision served a purpose. (*White v. White* (1978), 62 Ill. App. 3d 375, 378 N.E.2d 1255.) It may have been intended that the period in which no amendment may take effect would serve as a time of stability to allow for long-term planning on the part of the property owners without the fear of immediate changes in restrictions. In any event, the 20-year period is in the provision, and no reason has been advanced as to why it should be ignored. See *White v. Lewis* (1972), 253 Ark. 476, 487 S.W.2d 615; *Robinson v. Morris* (La. App. 1973), 272 So. 2d 444.

■ The record contains an affidavit by Carol Beldon, an officer and director of Elsah Hills Corporation. Beldon, one of the drafters of the "Subdivision Restrictions," states that it was the intention of the drafters to permit amendments during the 20-year period. The affidavit is extrinsic evidence and may not be considered in order to contradict the clear meaning of the instrument. (*Storybook.*) Furthermore, the affidavit was apparently drafted by an attorney for purposes of this litigation and as such is self-serving and not particularly helpful in finding intent and purpose. *Diamond Bar Development Corp. v. Superior Court* (1976), 60 Cal. App. 3d 330, 131 Cal. Rptr. 458.

The trial court made no specific finding on the effective date of the amendments, but only refused to grant summary judgment on the position taken by Bailey. We affirm, based on the conclusion that the amendments to the original restrictions become effective after December 30, 1983.

Construction of the second disputed aspect of the restrictions requires a much more detailed examination of the instrument entitled "Subdivision Restrictions." It begins with the legal description of the 60 acres to which Elsah Hills Corporation had title in 1963 and of the 140 acres which was being purchased under contract. It then states:

> "WHEREAS, said Elsah Hills Corporation is about to subdivide and sell said real property now owned by it and subsequently to subdivide and sell said real estate being purchased by it, and desires in that behalf, for the benefit of itself and the

several purchasers of lots or parcels of said real property to prescribe certain standards, relating to the use and occupation of such real property.

NOW, THEREFORE, in consideration of the premises, and for the uses and purposes herein set forth, said Elsah Hills Corporation hereby declares that all conveyances of lots or parcels of said real estate comprised in the above described real estate made by said Elsah Hills Corporation, its grantees, successors and assigns, shall be subject to the conditions, provisions, restrictions and covenants hereinafter referred to as 'conditions', which shall apply to and bind the parties thereto, their heirs, successors, grantees, mortgagees and assigns."

There follow 25 provisions, 17 of which are proscriptions pertaining to land use. The balance are procedural or entitling in nature. Fifteen of the seventeen proscriptive provisions (Nos. 1-9, 12-15, 18, and 20) either are worded "no lot shall ***" or describe an activity which shall not be done "on any lot." Provision No. 10 forbids billboards on "any of said property," and provision No. 11 prohibits the keeping of livestock on "any lot or parcel." *In toto*, the restrictions prescribe conditions for a subdivision consisting of single family dwellings. The instrument contains no definition of either "lot" or "parcel."

Illini concedes that the recorded "Subdivision Restrictions" applies to all 200 acres in which Elsah Hills Corporation at one time had an interest. However, it contends that the two "parcels" which make up the unsubdivided 140 acres are not subject to the 15 proscriptive provisions which refer only to "lots." This assertion is mainly based on the argument that since the drafters referred to "lots and parcels" in the preamble, and thereafter applied some restrictions only to lots, and others to lots and parcels, then they intended to distinguish between the two. "The expression in a contract of one or more things of a class implies the exclusion of all not expressed." (*Suga v. Suga* (1962), 35 Ill. App. 2d 355, 359, 182 N.E.2d 922, 924.) We think the instrument itself raises serious doubts as to whether the drafters intended such a fine distinction.

The term "parcels" is only found four times in the instrument; twice in the preamble, in the prohibition of livestock, and the $25 per year limit on regular assessments. In all four instances, it is used in conjunction with "lots." Illini makes no attempt to distinguish between a "lot" and a "parcel," but merely maintains that a distinction must exist. Applying Illini's strict construction to the entire instrument, parcel owners are: (1) liable for general assessments, but are not subject to the delineated collection procedures; (2) are not subject to special assessments; (3) cannot vote on amendments to the restrictive covenants;

and (4) cannot vote on the composition of the subdivision building committee. We think it unlikely that the draftsmen intended such a result.

Paragraph 11 of the restrictions prohibits the keeping of livestock on "lots and parcels." However, paragraph 10 prohibits billboards on "any of said property." Either there is something other than a lot or parcel on which livestock can be kept, or, and more likely, the drafters were inconsistent in their use of language even in contiguous paragraphs.

Illini has suggested that the two proscriptive covenants which apply to more than merely "lots," *i.e.*, the prohibitions against livestock and billboards, are of a distinctive nature, and that many of the other proscriptive covenants could not logically be applied to a large parcel. For example, Illini would be limited to building only one dwelling on each of the two parcels making up the 140 acres. We conclude that this presents no barrier inasmuch as the parcel can be subdivided into lots, thus allowing more dwellings, and as discussed hereunder, such subdivision was intended. Furthermore, there is no logical reason why parcels would not have been made subject to many of the remaining covenants such as those prohibiting (1) water and sewage systems not in compliance with the State Board of Health regulations, (2) obnoxious activities, (3) construction without approval of the building committee, and (4) fences on corners which obstruct vision from roadways.

Also, the intention of the drafters should not be determined by referring to particular words or isolated phrases (*Leiter v. Fleetwood Realty Corp.* (1981), 95 Ill. App. 3d 212, 419 N.E.2d 519), but each part should be viewed in the light of the other parts (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 154 NE.2d 683). The preamble states that Elsah Hills Corporation's intent was to subdivide and sell all 200 acres, and that the restrictions were being imposed for the benefit of itself and the purchasers. We think it clear from the preamble that Elsah Hills Corporation intended all of the restrictions to apply to all of the property in order to encourage sales of the lots, and at worst, the confused use of terminology in the body of the instrument creates an ambiguity.

An examination of the extrinsic evidence supports the position that Elsah Hills intended all of the restrictions to apply to all the property. Within this opinion is a reproduction of a brochure describing the planned Elsah Hills subdivision. The brochure was attached to an affidavit by Bailey and submitted for consideration in his motion for summary judgment. His uncontradicted statement was that the brochure was handed to him at the time he considered purchasing a lot in Elsah Hills.

PRELIMINARY LAYOUT of
# ELSAH HILLS
LOCATED IN N. ½ OF SECTION 22 T.6N., R.11W.
JERSEY COUNTY, ILLINOIS

Elsah Hills provides an opportunity for gracious country living in immediate proximity to Principia College and is situated minutes away from the cultural advantages and shopping facilities of Alton and St. Louis.

Spacious lots of about one acre* are laid out on high, broad ridges of a two hundred acre tract adjacent to Principia College. From the ridges, magnificent views of the rolling countryside extend in all directions. From many of the lots, The Great River is visible to the southeast toward Alton. The ravines between the ridges are forested and are the natural habitat for deer, raccoon, and often small friendly animals; cardinals, woodpeckers, and other beautiful birds; and redbud, dogwood, and a seasonal succession of wild flowers

The subdivision is about two miles from The Great River Road, a four-lane highway along the banks of the Mississippi River giving access to downtown Alton in about twelve minutes and to downtown St. Louis in about forty-five minutes. The front gate of the college is about one and one-half miles and Elsah about two miles to the west

A country club, golf course, and marina are located at Lockhaven, less than two miles away

Water and hard surfaced roads are to be provided in the subdivision. The plat above shows the location of lots, while the artist's sketch on the cover shows the landscape from a central point on the property with a view southeast to the Mississippi river.

You are invited to visit this property and enjoy it with us.

# ELSAH HILLS CORPORATION
P. O. Box 116 • Elsah, Illinois

Elsah Hills Corporation is formed by college faculty and staff members to make available unusually attractive homesites for themselves and for their friends who share common interests.

Financing Arrangements Are Available

This Corporation is not part of The Principia

*Lot range in size from about three quarters to over an acre and are laid out according to their conformance with the topography

Illini's two parcels are shown as located in the south central, and far east, plus far north areas of the subdivision and are labeled future development. These sections of the map contain dotted lines showing the prospective lots and streets. The unsubdivided property virtually surrounds the existing lots. We note that when the subdivided restrictions were recorded, Elsah Hills Corporation was not owner of record of the 140 acres, and thus it had not been subdivided. The record does not reflect whether Elsah Hills Corporation ever gained title to the 140 acres.

The first sentence of the second paragraph of the brochure reads, "Spacious lots of about one acre are laid out on high, broad ridges of a two hundred acre tract adjacent to Principia College." The brochure is clearly an attempt to attract prospective residential homeowners to a 200-acre subdivision containing only single-family dwellings. We think it patently obvious that a developer would wish to assure prospective homeowners in such a subdivision that the surrounding land would also be used for single-family dwellings. As declared in its preamble, it is for that purpose that the subdivision restrictions were drafted and recorded.

■ Illini argues that the previously discussed attempt by the lot owners to amend the restrictive covenants, and certain comments contained in a letter written by David Bailey and circulated with the proposed amendments among the lot owners show that the lot owners knew that not all of the existing restrictions applied to the 140 acres. We think that the same is only evidence that the lot owners were concerned as to how the restrictive covenants might be construed. It sheds little light on the intent of the drafters. We conclude that Elsah Hills Corporation's intent was to subdivide the entire 200-acre tract, and that each and every covenant of the "Subdivision Restrictions" was to apply to all 200 acres. Since we decide that "lots" and "parcels" are equivalent terms within the "Subdivision Restrictions," we need not consider whether the subdivision lot owners would be entitled to equitable relief in the absence of applicable recorded covenants.

Affirmed.

MILLS and TRAPP, JJ., concur.