FORTY-EIGHT INSULATIONS, INC., Plaintiff and Counterdefendant-Appellee, v. ANTONIO ACEVEDO *et al.*, Defendants and Counterplaintiffs-Appellants (Don W. Peterson *et al.*, Defendants).

Second District No. 84—0926

Opinion filed January 8, 1986.

Richard L. Horwitz and David J. Chroust, both of Drendel, Schanlaber & Horwitz, of Aurora, for appellants.

William C. Murphy, of Murphy, Hupp, Foote & Mielke, of Aurora, for appellee.

JUSTICE REINHARD delivered the opinion of the court:

Defendants and counterplaintiffs, 25 former employees of Forty-Eight Insulations, Inc. (Employees), appeal from a judgment of the circuit court of Kane County granting plaintiff-counterdefendant's, Forty-Eight Insulations, Inc. (Forty-Eight), requested relief in its declaratory action denying Employees' claim for separation pay under Forty-Eight's separation pay policy.

Employees raise the following issues on appeal: (1) whether the trial court erred as a matter of law in finding that the language of Standard Practice Bulletins D-20 issued in 1974 and 1977 must be interpreted as discretionary rather than mandatory; (2) whether the finding by the trial court that in actual practice the policy was administered in discretionary fashion was against the manifest weight of the evidence; (3) whether the trial court erred as a matter of law in finding that the separation of Employees occasioned by cessation of business by Forty-Eight was not contemplated in Forty-Eight's separation pay policies; and (4) whether the trial court erred in admitting evidence offered by Forty-Eight to show its intention and understanding as to the meaning and application of the Standard Practice bulletins regarding separation pay.

Employees are all former full-time managerial personnel with Forty-Eight. Four members of Employees, however, were not classified as "exempt salaried personnel" under the separation pay policy, but were hourly wage personnel. Whether these four were entitled to severance pay, as well, was disputed below, but is not an issue on appeal. Forty-Eight is an Illinois corporation which was in the business of manufacturing insulation and at one time manufactured items which contained asbestos. Forty-Eight ceased manufacturing operations on May 31, 1982. All Employees became employed by Fibrex, Incorporated (Fibrex), on June 1, 1982.

On August 30, 1982, Employees, through their attorneys, sent a letter to Forty-Eight demanding that the separation pay due and owing them under the law and under their employment contracts be paid to them immediately. Forty-Eight apparently did not respond to this letter, but instead, on September 2, 1982, filed a complaint for declaratory judgment requesting the circuit court to declare that it had no duty to pay involuntary separation pay to Employees in connection with Forty-Eight's termination of Employees and its cessation of manufacturing activities effective June 1, 1982. Employees answered

Forty-Eight's complaint, responding that they are entitled to separation pay pursuant to the provisions of certain policy bulletins distributed by Forty-Eight, and additionally, asserted an affirmative defense stating that Forty-Eight is estopped from denying its mandatory obligation to make severance payments to Employees. Forty-Eight replied that it had no mandatory obligation to pay severance pay to any of the Employees. Employees counterclaimed for separation pay and their attorney fees.

The following information was adduced at a bench trial through exhibits and testimony. Employees operated under an oral employment contract which incorporated an Employee Handbook published in 1980 that described the various activities and benefits involved with employment at Forty-Eight. The handbook also indicated that it did not include all the policies and procedures of the company, and any additional company policies or procedures would control over provisions in the handbook.

The handbook did not have a provision concerning separation pay. On March 28, 1974, however, Forty-Eight issued Standard Practice Bulletin D-20 entitled "Involuntary Separation-Exempt Salaried Personnel," which included the following provision:

"The company recognizes the importance to the welfare of employees involuntarily separated and feels a responsibility to the individual in these circumstances, so the following procedure has been established.

1. The company will pay the individual who is separated at the company's option in accordance with the following schedule, either in a single lump sum payment or semi-monthly for the duration of the separation period."

The schedule of payment was set forth therein. There were also provisions concerning the payment of earned bonuses, the continuation of an individual's group insurance coverage, the payment of retirement benefits, and the payment for accrued vacation time. This was to replace a similar policy issued on January 21, 1974, which could not be located and produced for trial. The exact language of that policy is unknown.

On August 8, 1977, Forty-Eight issued a new Bulletin D-20 entitled "Involuntary Separation-Exempt Salaried Personnel" purporting to cancel the one issued on March 28, 1974. This policy was substantially the same as the 1974 policy except that it no longer required Forty-Eight to continue an individual's group insurance coverage, but only allowed for it. In addition, the 1977 bulletin did not contain an introductory "purpose" paragraph, but instead immediately began

with the following provision:

> "1. A manager may authorize payment to an individual who involuntarily is separated at the company's option, only in accordance with the following schedule, either in a single lump sum payment or semi-monthly for the duration of the separation period."

The schedule of payment, however, remained the same.

Prior to the issuance of the 1977 Bulletin D-20, Forty-Eight issued Bulletin D-22 on February 16, 1977, setting forth its "General Policy on Compensation." This included a reference to separation pay as being a form of compensation for the individual's contributions to the welfare of the company. Both the 1977 Bulletins, D-20 and D-22, were reviewed and retained by Forty-Eight in 1978. The "D" series of bulletins are all personnel bulletins.

By 1982, Forty-Eight was defending approximately 13,000 civil lawsuits concerning asbestos-related diseases. Apparently facing a growing number of financial problems and the necessity of cutting costs, Forty-Eight issued a confidential interoffice correspondence concerning terminations. This correspondence, dated January 29, 1982, issued to only five people, set forth the policy for handling the terminations pursuant to a staff reduction including the following provision concerning severance pay:

> "2. All employees should be given two weeks' notice. In addition, they are eligible for at least one month's pay as severance pay, plus any leave they have accrued (holiday, vacation, etc.). Severance pay will be higher for some individuals, depending on status (exempt or non-exempt), length of service, etc."

In an additional attempt to survive, Forty-Eight planned to make some more terminations and issued a nonconfidential correspondence to all staff on April 2, 1982, which included the following provision on severance pay:

> "2. A few additional personnel reductions must unfortunately be made: notices will be given to the individuals. Our current financial condition does not permit us to pay severance (other than accrued vacation); however, a two-week notice will be given and health benefits will be continued for a month. We will endeavor to pay severance benefits in line with our policy as soon as possible."

On May 24, 1982, Forty-Eight announced to its employees that Fibrex would be leasing Forty-Eight's plant and equipment and taking over the operation of the facilities along with the production and sale of Forty-Eight brand products on June 1, 1982. Forty-Eight arranged

for its employees to remain at their jobs. Employees were informed, however, that Fibrex would make individual offers of employment and included a list of benefits that each employee was entitled to receive from Forty-Eight when Fibrex took over. There was no mention of severance pay, and Employees were advised that it would be unnecessary to inform Forty-Eight of each person's acceptance of the Fibrex offer. On May 26, 1982, the individual offers of employment, apparently at the same salary, were sent to all the employees. A brief outline of the benefits from Fibrex appears to have been included on this letter, but was not submitted into evidence. There was, however, an overview of employee benefits from Fibrex submitted with another exhibit which mentioned insurance, pension, holidays, vacations, company cars, bonus plans, sick leave and stock options. Each Employee's status sheet was marked terminated, and Employees had no option of remaining with Forty-Eight instead of joining Fibrex.

David Maxam, current president of Forty-Eight and former controller and vice-president, testified as to the reasons behind the various memos and bulletins and what these writings intended to accomplish. He stated that the purpose of adopting the 1974 policy was to assist Forty-Eight's employees in finding other employment when they were terminated by the company because the company was modernizing. In addition, over Employees' objection, the court allowed Maxam to testify as to his discussion with the former president of Forty-Eight, Victor von Schlegell, Jr. (in 1974), concerning the meaning of 1974 Bulletin D-20 and he stated, "We felt that we had to and wanted to retain the right to make discretionary payments under that policy." Maxam also testified that when 1977 Bulletin D-20 was adopted, 1974 Bulletin D-20 became null and void. He noted that the practice was to dispose of old memos which had been cancelled. The 1977 Bulletin was not intended, however, to change the substance or intent of the policy set forth in 1974 Bulletin D-20. Further, he stated, over objection, that the reason why there was no provision in the handbook for the allocation of separation pay was because it was not considered a benefit and an employee was not entitled to it. Maxam also testified that while they wanted to pay their employees separation pay during the 1982 terminations, by April 1982 they were no longer financially capable of doing so. Maxam could not testify, however, to whether Employees retained the same benefits when they joined Fibrex.

Victor von Schlegell III, president and chief executive of Fibrex and former president of Forty-Eight from April 1, 1979, until May 31, 1982, testified that when involuntarily separated employees received

separation pay, it would be given on a case-by-case basis. He did not recall Forty-Eight ever announcing that separation pay was required, but he always believed the policy to be discretionary. He continued that although Employees started at Fibrex with zero years of service on their record, Employees' salaries remained unchanged. Further, the benefits offered at Fibrex were somewhat different. For example, Fibrex could not initially afford to institute a vested pension plan, although a retirement plan was instituted six months after Fibrex took control of the plant. Also, Fibrex did not provide for dependent coverage on its employees' insurance and did not provide company cars. The holiday and sick day policies apparently remained substantially the same.

Jenefer Giannasi, an associate professor of English at Northern Illinois University, testified on behalf of Employees that in her opinion, the language used by Forty-Eight in Bulletins D-20 in 1974 and in 1977 was intended to create a mandatory commitment to pay separation pay. Willard Aebi, an Employee who was manager of technical services with Forty-Eight and now with Fibrex, testified that it was common knowledge among the employees at Forty-Eight for at least a couple of years prior to June 1, 1982, that anyone terminated would receive separation pay.

The trial court, in its judgment for Forty-Eight, found that the language utilized in Bulletin D-20, both the 1974 and 1977 versions, must be interpreted as discretionary, that the applications of the separation policy demonstrated the belief by those concerned that the separation pay policy was discretionary, and that the separation caused by the cessation of business was not the type contemplated in the separation pay policy.

For the reasons hereinafter set out, our resolution of the first issue raised by Employees makes it unnecessary to discuss the remaining contentions advanced by Employees on appeal. One of the trial court's findings was that the language of Standard Practice Bulletins D-20 issued in 1974 and 1977 regarding separation pay must be interpreted as discretionary. Employees contend that these bulletins became a part of the employment contract, that the construction of the unambiguous provisions of the contract is to be determined as a matter of law and not a matter of fact, that on such a question of law the reviewing court may independently construe the contract, and that in interpreting the contract the court must construe the bulletins most strictly against the drafter, Forty-Eight.

Employees further maintain that the 1974 Standard Practice Bulletin D-20 clearly states that the company "will pay" separation pay

to an individual who is involuntarily separated and such language is mandatory and unambiguous. They contend that the 1977 revision of Standard Practice Bulletin D-20 did not change the company's mandatory obligation to pay separation pay to its involuntarily separated employees. They point to the testimony of David Maxam that the 1977 Bulletin did not intent to change the substance or intent of the 1974 Bulletin on separation pay.

Forty-Eight does not disagree that the separation policy is a part of the employment contract, that the 1974 and 1977 Standard Practice Bulletins D-20 are unambiguous, and that their construction is a matter of law. Forty-Eight, however, does contend that the use of the word "may" in the 1977 Bulletin D-20 and the phrase "at the company's option" in both the 1974 and 1977 Bulletins D-20 clearly indicate a discretionary obligation.

■■ " 'The meaning of a written contract is ordinarily a question of law and not one of fact.' " (*Lenzi v. Morkin* (1984), 103 Ill. 2d 290, 293, 469 N.E.2d 178.) In the absence of an ambiguity, the intention of the parties at the time the contract was entered into must be ascertained by the language utilized in the contract itself and not by construction placed upon it by the parties. (103 Ill. 2d 290, 293, 469 N.E.2d 178.) As the construction of a contract presents an issue of law, in the absence of any material questions of fact the reviewing court may independently construe the contract. (*Ancraft Products Co. v. Universal Oil Products Co.* (1981), 100 Ill. App. 3d 694, 697-98, 427 N.E.2d 585; *Mazanek v. Rockford Drop Forge Co.* (1981), 98 Ill. App. 3d 956, 959, 424 N.E.2d 1271.) A contract's meaning must be determined from the words or language used, and a court cannot place a construction on the contract which is contrary to the plain and obvious meaning of the language. (*Johnstowne Centre Partnership v. Chin* (1983), 99 Ill. 2d 284, 287-88, 458 N.E.2d 480.) Extrinsic evidence may be introduced to explain the meaning of an ambiguous contract provision, but the provision is not rendered ambiguous simply because the parties do not agree on its meaning. 99 Ill. 2d 284, 288, 458 N.E.2d 480.

■ We agree with the parties that the language of the 1974 and 1977 Standard Practice Bulletin at issue is unambiguous, notwithstanding the fact that each party gives a different meaning to the language in question. (See *McDonald's Corp. v. Mazur* (1984), 127 Ill. App. 3d 608, 613, 469 N.E.2d 430.) Thus, the meaning of the bulletins, and the intention of Forty-Eight as drafter of the bulletins, must be gathered from the face of the bulletins without the assistance of parol evidence or any other extrinsic aids. (*Rakowski v. Lucente*

(1984), 104 Ill. 2d 317, 323, 472 N.E.2d 791.) Further, it is unnecessary under these circumstances to construe the language most strictly against the drafter, Forty-Eight (see *Farwell Construction Co. v. Ticktin* (1980), 84 Ill. App. 3d 791, 798-99, 405 N.E.2d 1051; *cf. United Fire Insurance Co. v. Schnackenberg* (1981), 88 Ill. 2d 1, 4, 429 N.E.2d 1203), as Employees contend because a court should not resort to rules of construction when the meaning is unambiguous. *Puckett v. Oelze* (1985), 134 Ill. App. 3d 1020, 1026, 481 N.E.2d 867.

The Standard Practice Bulletins D-20 on separation pay are, in pertinent part, as follows:

1974 Bulletin
"INVOLUNTARY SEPARATION -
EXEMPT SALARIED PERSONNEL

The company recognizes the importance to the welfare of employees involuntarily separated and feels a responsibility to the individual in these circumstances, so the following procedure has been established.

1. The company will pay the individual who is separated *at the company's option* in accordance with the following schedule, either in a single lump sum payment or semi-monthly for the duration of the separation period." (Emphasis added.)

1977 Bulletin
"INVOLUNTARY SEPARATION -
EXEMPT SALARIED PERSONNEL

1. A manager may authorize payment to an individual who involuntarily is separated *at the company's option,* only in accordance with the following schedule, either in a single lump sum payment or semi-monthly for the duration of the separation period." (Emphasis added.)

While there are several noticeable differences in the two bulletins in that the 1974 Standard Practice Bulletin D-20 contains an introductory purpose clause and the phrase "will pay" while the 1977 Standard Practice Bulletin D-20 does not, we do not find these changes affect our construction of the two bulletins; nor, according to Forty-Eight's president, David Maxam, was there any intention of changing the substance or intent of the separation pay policy by the 1977 revision.

Both bulletins, however, contain the phrase "at the company's option," a phrase we find to be very significant. The word "option" is defined in Webster's Dictionary as "an act of choosing *** the power or right to choose." (Webster's Third New International Dictionary

1585 (1966).) While employees contend that "at the company's option" refers to Forty-Eight's right to involuntarily terminate an employee, we believe that, in the context of the whole bulletin, the right to involuntarily terminate an employee is presupposed in the bulletin; and that the language of the separation pay policy embodied in the bulletins concerns Forty-Eight's right to choose if and when separation pay should be given to an involuntarily separated employee.

Employees, however, maintain that we should resort to rules of construction in interpreting the language of the bulletins. They argue that according to the "last antecedent" rule of contract interpretation, the phrase "at the company's option" concerns an individual who is separated and does not modify Forty-Eight's obligation to pay separation pay. Even assuming that such a rule could be invoked where the parties agree that the language of a writing is unambiguous, neither this rule nor logic would change the discretionary meaning of the separation policy we believe is embodied in the bulletins.

According to the "last antecedent clause" rule of construction, a qualifying phrase is to be confined to the last antecedent unless there is something in the instrument requiring a different construction. (*City Trust, Safe Deposit & Surety Co. v. Lee* (1903), 204 Ill. 69, 71-72, 68 N.E. 485; *Illini Federal Savings & Loan Association v. Elsah Hills Corp.* (1983), 112 Ill. App. 3d 356, 359, 445 N.E.2d 1193.) Employees confine "at the company's option" to the phrase "the individual who is separated," the last antecedent phrase before the modifying phrase in question. As such, Employees would have this court read the first procedure to mean that separation pay was due to those individuals involuntarily separated from Forty-Eight at Forty-Eight's option. This interpretation, however, would make the phrase involuntarily separated meaningless and the phrase "at the company's option" redundant. Contractual terms should be construed so as to avoid the conclusion that other terms of the writing are redundant or meaningless. (*DeWitt County Public Building Com. v. City of DeWitt* (1984), 128 Ill. App. 3d 11, 18, 469 N.E.2d 689.) Our reading of the 1974 Bulletin D-20 as a whole reveals that the title of the subject matter and introductory purpose clause establish that the procedure which followed it applied to employees involuntarily separated from the company and that the phrase "at the company's option" modifies the *antecedent clause* which precedes it, namely that the company will pay the individual who is separated involuntarily, and not just the phrase, "the individual who is separated." This reading of the 1974 Bulletin D-20 is reinforced by the 1977 Standard Practice Bulletin D-20 which eliminated the introductory purpose paragraph opting to in-

stead simply state that the separation pay policy applied only to those individuals who were involuntarily separated from the company. Thus, even applying the "last antecedent clause rule" to this writing, the only logical interpretation of the bulletins giving all the words and phrases meaning would be that Forty-Eight created a discretionary separation pay policy which, if the company determined an involuntarily, and not voluntarily, separated employee was deserving of separation pay, required Forty-Eight to pay such discretionary pay in accordance with the schedule which followed it. The inclusion of the phrase "a manager may authorize payment" in the 1977 Bulletin D-20 simply specified who would be making the discretionary decision.

Accordingly, we determine as a matter of law that the unambiguous terms of the separation pay policy provide for only a discretionary obligation on the part of Forty-Eight to give separation pay to Employees. On this basis the judgment below is affirmed, and we need not discuss the correctness of the other findings by the trial court.

Affirmed.

NASH, P.J., and STROUSE, J., concur.