**FEDERAL DEPOSIT INSURANCE CORPORATION,**
**Plaintiff–Appellee,**

v.

**W.R. GRACE & CO. and Grace Petroleum Corporation,**
**Defendants–Appellants.**

No. 88–2275.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 23, 1989.

Decided June 21, 1989.

Rehearing and Rehearing En Banc
Denied Sept. 11, 1989.

Denis McInerney, Cahill Gordon & Reindel, Charles A. Gilman, New York City, W. Donald McSweeney, Schiff Hardin & Waite, Allan Horwich, Chicago, Ill., for defendants-appellants.

William E. Rattner, Hopkins & Sutter, Paul K. Vickrey, Thomas M. Dethlefs, Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and POSNER and RIPPLE, Circuit Judges.

POSNER, Circuit Judge.

This case began as a diversity suit (governed, the parties agree, by Illinois law) for fraud. The plaintiff was Continental Illinois National Bank, the defendants W.R. Grace & Co. and its wholly owned subsidiary, Grace Petroleum Corporation. The parties treat the two Graces as interchangeable; so shall we. The appeal presents questions of contract law and damages.

Continental had made a $75 million nonrecourse production payment loan to Grace to enable it to develop some natural-gas fields in Mississippi, and when one of the fields turned out to be worthless Continental contended that Grace had induced the loan by fraud. Shortly after filing the suit

Continental assigned the loan to the Federal Deposit Insurance Corporation, which had bailed out the failing Continental. The FDIC substituted itself for Continental as the plaintiff and switched the statutory basis of federal jurisdiction from 28 U.S.C. § 1332 (diversity) to 28 U.S.C. § 1345 (suits "commenced by" the United States), 12 U.S.C. § 1819 (the Federal Deposit Insurance Corporation Act), and 28 U.S.C. § 1331 (federal-question jurisdiction). After a four-week trial a jury awarded the FDIC $25 million in compensatory damages and $75 million in punitive damages. The district judge cut the award of punitive damages to $25 million.

 Grace appeals, raising a variety of grounds of which the first and least is that there is no federal jurisdiction. The jurisdiction of suits by and against the FDIC is specified in section 1819 Fourth of the Banking Code, which provides that all suits to which the FDIC is a party shall be deemed to arise under the laws of the United States (thus bringing section 1331, the federal-question statute, into play), unless the FDIC is a party "in its capacity as receiver of a State bank." Since Continental is a national bank rather than a state bank, this exception to federal jurisdiction would not apply even if the FDIC had been suing as a receiver, which it was not; an assignee is not a receiver. See, e.g., *FDIC v. Braemoor Associates*, 686 F.2d 550, 552–53 (7th Cir.1982); *FDIC v. Elefant*, 790 F.2d 661, 665 (7th Cir.1986) (dictum). *Elefant* hints that substituting the FDIC for a state bank in a diversity suit that had already been filed would not destroy diversity jurisdiction, see *id.* at 666, unless the assignment was for the purpose of conferring federal jurisdiction where it would not otherwise exist. See 28 U.S.C. § 1359; *Hartford Accident & Indemnity Co. v. Sullivan*, 846 F.2d 377, 382 (7th Cir.1988). Jurisdiction normally depends on the facts when the case was brought rather than on what happens later. But no more than in *Elefant* need we resolve the issue in order to confirm the district court's jurisdiction; Continental was not a state bank.

Grace has not shown any error in the district judge's jury instructions or evidentiary rulings, so we take the facts to be as favorable to the FDIC as a reasonable jury could have found them to be. In 1980 Grace decided to bid for a 50 percent interest in three natural-gas fields owned by a subsidiary of Centex Corporation—the Thomasville, East Thomasville, and Southwest Piney Woods fields, all in the same part of Mississippi. Four wells had already been drilled in the first two fields and three were planned for Southwest Piney Woods, of which one had been drilled but was not yet producing. To finance the purchase, Grace went to its long-time banker, Continental, for a $75 million "nonrecourse production payments loan"—a loan repayable only out of the revenues from the gas fields and not out of Grace's other assets. If the fields proved to be nonproductive, the loan would not be repaid and Continental would have no remedy for the default.

Officers of Grace showed Continental a reserve report prepared by an independent engineering firm. The report showed Southwest Piney Woods with 42 percent of the total gas reserves in the fields, although none of the proven reserves because no producing wells had been drilled yet in that field. A petroleum engineer employed by Continental reviewed the reserve report and concluded that the proven reserves in the other two fields—all he considered—had a loan value of $75 million. This was exactly equal to the loan that Grace was seeking and so left no margin for error. Next to the Southwest Piney Woods estimates the engineer wrote, "all assumed Dry!" Apparently this was his way of saying that in order to be ultraconservative in his evaluation he had ignored Southwest Piney Woods because it had no producing wells as yet. (In other words, the emphasis falls on the word "assumed.") Despite his evaluation of the Thomasville and East Thomasville fields, he told his boss that he was uncomfortable about the loan, but his boss reassured him by pointing out that the Southwest Piney Woods field could be pledged to repay the loan too, and this would provide insurance in case the Thomasville fields turned out to be less

productive than expected or the price of gas fell. Consistent with this assurance, when Grace asked Continental to exclude Southwest Piney Woods from the properties dedicated to the repayment of the loan Continental refused.

On March 14, 1980, Continental wrote Grace that it was "pleased to commit to provide $75,000,000 in a production payment loan for the benefit of W.R. Grace & Co. The terms of the loan are summarized below." Provisions follow regarding interest rate (prime plus one percent), balances, maturity (December 31, 1987), security, etc., followed by the statement, "This commitment is, of course, subject to satisfactory documentation." Continental followed up with another letter to Grace on April 1, setting forth in five single-spaced pages "the principal terms and conditions of the financing" and stating at the end that "the above discussion does not constitute an exhaustive list of all the terms and conditions of the financing, but does cover those items of major importance." A virtually identical letter, differing only in being slightly longer, was sent on April 7. The final loan agreement, in which satisfactory final loan documentation is made a condition precedent to Continental's duty to perform, was signed on July 1, and disbursal of the $75 million to Grace followed shortly.

Centex had accepted Grace's $87 million bid for the Mississippi properties early in April, and the parties to that deal had agreed to close on May 23. On May 8, Grace, which pursuant to its still-executory contract with Centex was receiving frequent reports on the progress of the gas-exploration activities in the properties, learned that "Pursue Ridgeway," the well that had been drilled in the Southwest Piney Woods field, had struck water instead of gas. This was bad enough; but by May 18 Grace had discovered that the field would produce no gas, from any well. Grace was horrified. It had valued Pursue Ridgeway at $15.5 million even though the well had not yet started producing any gas. This was 17.1 percent of the entire deal. The well, along with the rest of the field, was now revealed to be worthless. Grace tried to back out of the deal with Centex,

but when Centex threatened to sue, Grace decided to go ahead with the deal, which closed on May 27 with a covenant allowing Grace to sue Centex.

The next day Centex issued a press release announcing the sale to Grace and mentioning in passing that Pursue Ridgeway was "non-commercial." A news service to which Continental subscribed carried the release, but no one at Continental concerned with the Grace loan noticed it. Although Grace had issued its own press release on April 22 announcing the signing of the contract with Centex to buy the Mississippi properties, it issued no press release announcing the actual purchase. And it did not tell Continental about the problem with the Southwest Piney Woods field until, three *years* after the loan was closed, it sent Continental a copy of the complaint it had filed against Centex, alleging that Centex had defrauded Grace by failing to disclose the water problem in Southwest Piney Woods. That suit was later settled for $13 million. The present suit was filed in 1984 and came to trial in 1987, at which time the balance of the $75 million loan, consisting both of principal and of unpaid interest, exceeded $76 million, even though the loan was due to be repaid in only three months. The Thomasville fields were and are productive, but gas prices had tumbled, and the volume of production was not high enough to generate revenues sufficient to repay the loan— which to this day has not been repaid.

Several points raised by Grace are shallow:

█ 1. The fact that Continental may have been deficient in alertness in failing to notice the item in the press release about Pursue Ridgeway might be relevant if this were a suit for negligence, but it is a suit for deliberate fraud, and contributory negligence is not a defense to an intentional tort. See, e.g., *Tan v. Boyke*, 156 Ill. App.3d 49, 57, 108 Ill.Dec. 229, 234, 508 N.E.2d 390, 395 (1987); *Carter v. Mueller*, 120 Ill.App.3d 314, 319–20, 75 Ill.Dec. 776, 781, 457 N.E.2d 1335, 1340 (1983); *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72

Ill.App.3d 37, 51–52, 28 Ill.Dec. 226, 328–29, 390 N.E.2d 393, 405–06 (1979); *General Motors Acceptance Corp. v. Central National Bank*, 773 F.2d 771, 782 (7th Cir. 1985) (construing Illinois law); *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 454 (7th Cir.1982) (same); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 527–28 (7th Cir.1985); Prosser and Keeton on the Law of Torts 462 (5th ed. 1984).

2. That Continental's petroleum engineer, in assessing the loan value of the three fields, assumed the Southwest Piney Woods field to be nonproducing does not prove that the fraud was immaterial. Continental regarded the Southwest Piney Woods field as an important back-up to the Thomasville fields. The fact that this was a nonrecourse loan made Grace's failure to disclose the fate of that field particularly significant. Continental could not look to Grace for repayment of the loan but only to the revenues generated by the gas fields themselves, revenues dependent on production as well as on the price of gas. *Any* diminution in that revenue potential was ominous. Grace's own reaction when it heard that the Southwest Piney Woods field was worthless bears eloquent witness to the perceived value of that field.

3. Grace's complaints about the jury instructions, the admission of certain evidence, and the sufficiency of the evidence to demonstrate its intention to conceal material information from Continental have no merit.

The difficult question on liability is whether Grace was required to volunteer to Continental, before the loan closed, the bad news about the Southwest Piney Woods field. An omission can of course be actionable as a fraud. See, e.g., *Tan v. Boyke, supra*, 156 Ill.App.3d at 54, 108 Ill.Dec. at 232, 508 N.E.2d at 393; *Chapman v. Hosek*, 131 Ill.App.3d 180, 186–88, 86 Ill.Dec. 379, 384–85, 475 N.E.2d 593, 598–99 (1985); *Central States Joint Board v. Continental Assurance Co.*, 117 Ill.App. 3d 600, 604, 73 Ill.Dec. 107, 110, 453 N.E.2d 932, 935 (1983); *Allensworth v. Ben Franklin Savings & Loan Ass'n*, 71 Ill.

App.3d 1041, 27 Ill.Dec. 620, 389 N.E.2d 684 (1979). But not *every* failure by a seller (or borrower, or employee, etc.) to disclose information to the buyer (or lender, or employer, etc.) that would cause the latter to reassess the deal is actionable. A general duty of disclosure would turn every bargaining relationship into a fiduciary one. There would no longer be such a thing as arm's-length bargaining, and enterprise and commerce would be impeded. The seller who deals at arm's length is entitled to "take advantage" of the buyer at least to the extent of exploiting information and expertise that the seller expended substantial resources of time or money on obtaining—otherwise what incentive would there be to incur such costs? See *Teamsters Local 282 Pension Trust Fund v. Angelos, supra*, 762 F.2d at 528; *United States v. Dial*, 757 F.2d 163, 168 (7th Cir. 1985); Kronman, *Mistake, Disclosure, Information, and the Law of Contracts*, 7 J.Legal Stud. 1 (1978). But when the seller has without substantial investment on his part come upon material information which the buyer would find either impossible or very costly to discover himself, then the seller must disclose it—for example, must disclose that the house he is trying to sell is infested with termites. See, e.g., *Posner v. Davis*, 76 Ill.App.3d 638, 32 Ill.Dec. 186, 395 N.E.2d 133 (1979) (basement flooding). The distinction between the two classes of case is illustrated by *Lenzi v. Morkin*, 103 Ill.2d 290, 82 Ill.Dec. 644, 469 N.E.2d 178 (1984), where the failure to disclose an assessor's valuation was held not to be actionable, since the valuation was a matter of public record and therefore ascertainable by the buyer at reasonable cost. See also *Illinois Central Gulf R.R. v. Department of Local Government Affairs*, 169 Ill.App.3d 683, 120 Ill.Dec. 137, 523 N.E.2d 1048 (1988).

The situation of the would-be lender who discovers that his collateral (or a major part of it) is worthless because of circumstances that the borrower learned without effort or expertise but that the lender could not have learned without a substantial investment of time or effort seems

assimilable to that of the seller of the termite-infested house. But this we need not decide for certain, since we do not understand Grace to be contesting the issue of duty but only to be arguing that Continental had made a firm commitment by April 7 (if not earlier)—a commitment that it could not have backed out of even if Grace had come to it on May 8 and told it that the Loch Ness monster had swallowed the entire State of Mississippi so that Continental would not recoup a penny of the $75 million loan that it had not yet made but was committed to make. If the commitment was *that* firm, the fraud was immaterial. See *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 447 (7th Cir.1987) (dissenting opinion), and cases cited there. If not, then we do not (to repeat) understand Grace to be arguing that it was entitled to stand mute when the time came to make the final agreement. If you go to a bank for a loan on your house, and the bank tentatively agrees to make it, and on the day before the loan papers are to be signed the house is destroyed by a flood and you don't disclose the fact at the signing, then we suppose—and, more to the point, Grace appears to concede—that you are guilty of fraud even if you made no representation that the house was still in existence. This case is less dramatic inasmuch as the security for the loan was not rendered completely worthless by the Pursue Ridgeway disaster—but more dramatic in that the lender here, unlike the lender in the house example, could not sue the borrower if the assets pledged to repay the loan proved insufficient, because it was a nonrecourse loan.

So it is crucial to determine whether there was a commitment before May 8. The March and April letters were preliminary to a final agreement, but not necessarily on that account unenforceable. The question when a preliminary agreement is enforceable is a vexed one, as we noted recently in *Empro Mfg. Co. v. Ball-Co Mfg., Inc.,* 870 F.2d 423 (7th Cir.1989); see also Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations,* 87 Colum.L.Rev. 217, 249–63 (1987). But Illinois law is reasonably clear in making the issue one of the parties' intentions as gleaned from the agreement itself if the agreement is unambiguous and, if it is ambiguous, from all pertinent evidence. See *Anand v. Marple,* 167 Ill.App.3d 918, 118 Ill.Dec. 826, 522 N.E.2d 281 (1988); *Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.,* 137 Ill.App.3d 550, 559, 92 Ill.Dec. 323, 330, 484 N.E.2d 1178, 1185 (1985); *Inland Real Estate Corp. v. Christoph,* 107 Ill.App.3d 183, 185–86, 63 Ill.Dec. 9, 11, 437 N.E.2d 658, 660 (1981); *Interway, Inc. v. Alagna,* 85 Ill.App.3d 1094, 41 Ill.Dec. 117, 407 N.E.2d 615 (1980). In cases where a preliminary agreement has been superseded by a final one, the parol evidence rule forbids the use in evidence of the preliminary agreement to alter the terms in the final one. See *Fidelity & Deposit Co. v. City of Sheboygan Falls,* 713 F.2d 1261, 1271 (7th Cir.1983); *Patton v. Mid–Continent Systems, Inc.,* 841 F.2d 742, 745 (7th Cir.1988); Farnsworth, Contracts 451 (1982). But here we have no final integrated agreement—no agreement into which any preliminary agreements would merge and disappear—so the rule is inapplicable.

With the parol evidence rule out of the way, two types of ambiguity can usefully be distinguished. One is internal ("intrinsic"), and is present when the agreement itself is unclear. The other is external ("extrinsic") and is present when, although the agreement itself is a perfectly lucid and apparently complete specimen of English prose, anyone familiar with the real-world context of the agreement would wonder what it meant with reference to the particular question that has arisen. See, e.g., *Patton v. Mid–Continent Systems, Inc., supra,* 841 F.2d at 745; *Amoco Oil Co. v. Ashcraft,* 791 F.2d 519, 521 (7th Cir.1986). So parol and other extrinsic evidence is admissible, even in a case involving a contract with an integration clause, to demonstrate that the contract is ambiguous. See, e.g., *Stamatakis Industries, Inc. v. King,* 165 Ill.App.3d 879, 887, 117 Ill.Dec. 419, 424, 520 N.E.2d 770, 775 (1987); *Zale Construction Co. v. Hoffman,* 145 Ill.App.3d 235, 241, 98 Ill.Dec. 708, 712,

494 N.E.2d 830, 834 (1986); *UIDC Management, Inc. v. Sears Roebuck & Co.*, 141 Ill.App.3d 227, 230, 95 Ill.Dec. 691, 693, 490 N.E.2d 164, 166 (1986); *Sunstream Jet Express, Inc. v. International Air Service Co.*, 734 F.2d 1258, 1268 (7th Cir.1984) (construing Illinois law); *Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir. 1987) (per curiam). Admissible, that is to say, even if the contract has no intrinsic ambiguity—even if it would seem perfectly clear to a normal reader of English, although to persons knowledgeable about the circumstances in which the contract had been intended to apply the "normal" reading might be nonsense. See *Lucie v. Kleen–Leen, Inc.*, 499 F.2d 220 (7th Cir. 1974) (per curiam); *Isbrandtsen v. North Branch Corp.*, 556 A.2d 81, 83–85 (Vt. 1988); Farnsworth, *supra*, at 501. That is what it means to say that extrinsic evidence is admissible to *demonstrate* an ambiguity. There is no ambiguity on the surface of the document; the ambiguity appears only when extrinsic evidence is considered.

The Illinois cases provide firmer support for allowing extrinsic evidence when the contract is patently ambiguous than for allowing such evidence to establish that an otherwise clear contract is (to those in the know) ambiguous. See, e.g., *LaSalle National Bank v. General Mills Restaurant Group, Inc.*, 854 F.2d 1050, 1052 (7th Cir. 1988) (applying Illinois law). The Illinois Appellate Court is, as we noted in *Metalex Corp. v. Uniden Corp.*, 863 F.2d 1331, 1335–36 (7th Cir.1988), divided on the latter question. Compare, for example, *URS Corp. v. Ash*, 101 Ill.App.3d 229, 233–35, 56 Ill.Dec. 749, 753–54, 427 N.E.2d 1295, 1299–1300 (1981), with *United Equitable Ins. Co. v. Reinsurance Co.*, 157 Ill.App.3d 724, 730–31, 109 Ill.Dec. 846, 810–11, 510 N.E.2d 914, 918–19 (1987). The Supreme Court of Illinois has not resolved the conflict. Although *United Equitable* opines that the supreme court *did* resolve it, against allowing extrinsic evidence to demonstrate an ambiguity, in *Rakowski v. Lucente*, 104 Ill.2d 317, 323, 84 Ill.Dec. 654, 657, 472 N.E.2d 791, 794 (1984), many of the cases that allow the admission of extrinsic evidence for such purpose were decided after *Rakowski* and find that decision distinguishable.

The older view, sometimes called the "four corners" rule, which excludes extrinsic evidence if the contract is clear "on its face," is not ridiculous. (There is ancient wisdom as well as ancient prejudice.) The rule tends to cut down on the amount of litigation, in part by reducing the role of the jury; for it is the jury that interprets contracts when interpretation requires consideration of extrinsic evidence. Parties to contracts may prefer, ex ante (that is, when negotiating the contract, and therefore before an interpretive dispute has arisen), to avoid the expense and uncertainty of having a jury resolve a dispute between them, even at the cost of some inflexibility in interpretation.

We suspect that the alleged conflict within the Illinois Appellate Court is a pseudo-conflict; one straw in the wind is that the author of *United Equitable* also wrote *Zale*. Most of the modern cases in the "four corners" line stand for the unexceptionable proposition that "language in a contract is not rendered ambiguous simply because the parties do not agree upon its meaning." *Reynolds v. Coleman*, 173 Ill. App.3d 585, 593, 123 Ill.Dec. 259, 265, 527 N.E.2d 897, 903 (1988). In *Rakowski* itself the extrinsic evidence that Lucente sought to introduce was an affidavit that "contains only his unsubstantiated assertion that he did not intend to include his right to seek contribution in the matters released." 104 Ill.2d at 324, 84 Ill.Dec. at 657, 472 N.E.2d at 794; see also *Forty–Eight Insulations, Inc. v. Acevedo*, 140 Ill.App.3d 107, 113–14, 94 Ill.Dec. 329, 333, 487 N.E.2d 1206, 1210 (1986). The fact that parties to a contract disagree about its meaning does not show that it is ambiguous, for if it did, then putting contracts into writing would provide parties with little or no protection. Several of the cases in the "four corners" line involve releases, and the courts stress the importance of encouraging settlements by enforcing releases according to their tenor. *Rakowski* was such a case; also *Kolar v. Ray*, 142 Ill.App.3d 912, 97 Ill.

Dec. 240, 492 N.E.2d 899 (1986). These cases stand for the proposition that the words of the contract are not lightly to be ignored. The nature of the offer of proof to show an ambiguity is therefore critical. Although a self-serving statement, à la Lucente, that a party did not understand the contract to mean what it says (or appears to say) will not suffice, an offer to show that anyone who understood the context of the contract would realize it couldn't mean what an untutored reader would suppose it meant will.

Both forms of ambiguity, the intrinsic (or internal) and the extrinsic (or external), are present here and made the meaning of the contract a question for the jury, whose answer we can disturb only if it is unreasonable. First, the term "subject to satisfactory documentation," which was implicit in the April 1 and April 7 letters even though not recited in them, is ambiguous. It could mean just proof of the assumptions underlying the terms and conditions set forth in the letters, assumptions such as that Grace would own the Mississippi properties by the time the loan was closed. Or it could entitle Continental to insist that Grace document any material assumptions on which Continental's willingness to commit $75 million to Grace was based. On this reading, if Continental had discovered before the closing that the reserve report on which it had relied in evaluating the loan was inaccurate, it could have required Grace to demonstrate that the loan was nevertheless as secure as Continental had originally believed. Cf. UCC § 2–609.

The external ambiguity lies in the fact that, to anyone cognizant of the commercial setting, the agreement was incomplete. It did not address a range of possible risks that might materialize between the commitment and the closing. Cf. *Fidelity & Deposit Co. v. City of Sheboygan Falls, supra,* 713 F.2d at 1271. For example, it would have been odd if by virtue of making a loan commitment Continental had become in effect the fire insurer of the Mississippi properties on the theory that it would have owed Grace $75 million even if the properties had been destroyed by fire between April 7 and the July closing and, given the nonrecourse feature of the loan, could not have gotten the money back. It may be that the commitment was implicitly conditioned on the circumstances of the loan remaining materially unchanged between the commitment date and the closing. This is a possible, not a necessary, interpretation. Grace may have wanted a firmer commitment before agreeing to lay out $87 million to buy the properties from Centex. The only question for us is whether the agreement was so plainly a commitment by Continental to make a nonrecourse loan of $75 million to Grace come what may that the jury would have had to be irrational to find that Grace's failure to inform Continental about the disaster that befell the Southwest Piney Woods field was material. This we cannot say. The jury was entitled to conclude that the commitment fee (a modest one-half of one percent per annum on the unused portion of the loan, i.e., on any part of the $75 million that Grace decided *not* to take up) was to compensate Continental for agreeing to make the loan at the agreed interest rate, and other terms and conditions, *provided nothing new and material came to light between the commitment and the closing.* Perhaps the most telling piece of extrinsic evidence is Grace's own conduct in trying to conceal the bad news from Continental; it would have had no reason to do so under the interpretation of the contract that it is now pressing.

We turn to the issue of damages. Grace focuses most of its attack on the award of punitive damages, which it contends violates the excessive-fines clause of the Eighth Amendment and other provisions of the Constitution. Twenty-five million dollars is of course a large amount, but its reasonableness must be assessed in relation to the amount of injury done by the tortfeasor. The concern in recent cases dealing with the constitutionality of punitive-damages awards has centered on awards that are huge multiples of the compensatory damages, as in *Kelco Disposal, Inc. v. Browning–Ferris Industries, Inc.,* 845 F.2d 404, 410 (2d Cir.), cert. granted,

—— U.S. ——, 109 S.Ct. 527, 102 L.Ed.2d 559 (1988) (argued before the Supreme Court on April 18), where the punitive damages awarded were more than 100 times greater than the compensatory damages. Treble damages are a common form of punitive damages, and we do not understand their constitutionality to be in question. The FDIC received only double damages.

■ The most straightforward rationale for punitive damages, as for fines and other criminal punishments that exceed the actual injury done by (or profit obtained by) the tortfeasor or criminal, is that they are necessary to deter torts or crimes that are concealable. Suppose the average defrauder is brought to book only half the time. To confront him with a sanction that will make fraud worthless to him and thus deter him, it is necessary that when he is caught he be made to pay twice as much as his profits. In such a case double damages would certainly not be problematic. Fraud is a concealable tort, and indeed concealment was the essence of Grace's fraud. Only after Grace thought it was home free —in fact three years after it thought it was home free—did it reveal the fraud by sending Continental a copy of the complaint it had filed charging Centex with fraud.

■ Concealment is not the only rationale for punitive damages, although no other one is necessary to establish the propriety of an award of punitive damages in this case. Another rationale is that punitive damages provide surer deterrence than actual damages of conduct that we very much want to deter because it is highly anti-social. Fraud, a form of intentional wrongdoing, is in that category. Under this rationale, too, the ratio of punitive to actual damages is highly pertinent. A $100 fraud might be securely deterred by a $500 penalty on top of compensatory damages, making a total of $600; a $25 million fraud would not be securely deterred by a $500 penalty, making a total of $25,000,500. The common law of Illinois authorizes substantial awards of punitive damages in cases of fraud. See *West v. Western Casualty & Surety Co.*, 846 F.2d 387, 398–401

(7th Cir.1988). The award here was excessive neither by Illinois nor by federal constitutional standards.

■ The problem is with the award of *compensatory* damages. We have railed repeatedly against the extraordinary casualness that otherwise proficient trial lawyers display at the remedy stage in commercial litigation. See *Patton v. Mid–Continent Systems, Inc., supra*, 841 F.2d at 748 (collecting cases). All their energies seem to be used up in proving (or disproving) liability. This case is no exception despite the huge stakes. It would have been easy to estimate the present value of the loan to Grace at the time of trial, to add the interest that Continental had already received on the loan, and to subtract the sum from the principal and interest that Continental would have obtained from an alternative use of the $75 million that it disbursed on the loan. For that is the measure of what Continental lost as a result of the fraud. One alternative, of course, is that Continental would have made a smaller loan to Grace, and placed the difference elsewhere; then the experience of the sum of these hypothetical loans, compared to the experience of the actual loan, would provide the measure of Continental's loss.

Suppose hypothetically that at the time of trial, the present value of the $75 million loan that Continental made to Grace was $30 million (representing a heavy discount from the face amount of the loan, in recognition of the unlikelihood that it will actually be repaid), and Continental had already received $65 million in interest. Then the total benefit to Continental from the loan (ignoring as we shall throughout this example, for simplicity's sake, adjustments necessary to reflect changes in the value of the dollar due to inflation) would be $95 million. Suppose further that if Grace had disclosed the Pursue Ridgeway disaster to Continental, then, instead of making the $75 million nonrecourse loan to Grace, Continental would have placed the $75 million in a loan or loans (perhaps including a smaller loan to Grace) that would have yielded Continental a benefit to the date of

trial of $130 million. Then its damages would be $35 million ($130 million minus $95 million).

 No evidence enabling such a computation to be made was presented. The jury was allowed to pick a figure out of the air after hearing testimony that Grace's own projections of price and production from the producing fields showed that the loan would probably never be repaid. The underlying figures were not placed in evidence. Although Grace can be faulted for having failed to offer its own evidence of damages—a fault we have noted in recent cases, see, e.g., *Lancaster v. Norfolk & Western Ry.*, 773 F.2d 807, 823 (7th Cir. 1985); see also *Wallace Motor Sales, Inc. v. American Motor Sales Corp.*, 780 F.2d 1049, 1062 (1st Cir.1985), and cases cited there—the FDIC had the burden of proving what it lost, and it failed to carry the burden, resulting in a multi-million-dollar damages verdict that is pure guesswork. This is not a case where the defendant's wrongful conduct made it difficult to establish the plaintiff's damages, a situation where lenity in proof of damages is traditionally allowed. See, e.g., *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 266, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946); *Bob Willow Motors, Inc. v. General Motors Corp.*, 872 F.2d 788, 799 (7th Cir.1989); *Jay Edwards, Inc. v. New England Toyota Distributor, Inc.*, 708 F.2d 814, 821 (1st Cir.1983).

Grace is entitled to a new trial, though one limited to damages. The amount of punitive damages, related as they are to compensatory damages, will have to be redetermined as well in the new trial that we are ordering. We could take the position that the first trial fixed the ratio of punitive to compensatory damages as one to one, so that whatever the next award of compensatory damages is it will just have to be doubled to yield the final judgment (before interest). But proportionality to actual damages is not the only consideration in determining how large the award of punitive damages should be, so the ratio will have to be redetermined in the new trial that we are ordering on damages.

The judgment is affirmed in part and reversed in part, and the case remanded for a new trial limited to damages. There shall be no award of costs in this court.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.