ZALE CONSTRUCTION COMPANY, Plaintiff-Appellant, v. DAVID HOFF-MAN *et al.*, Defendants-Appellees.

First District (5th Division) No. 85—1740

Opinion filed June 6, 1986.

236

Jack J. Herman, P.C., of Chicago, for appellant.

Theodore A. Shapero, Diane Fields Geocaris, and Thomas F. Geselbracht, all of Rudnick & Wolfe, of Chicago, for appellees.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal from an order granting summary judgment for defendants in an action by plaintiff to recover money expended by it to construct an off-site waterline. Plaintiff contends that summary judgment was improperly granted because the contract established that defendants were to pay for installation of the off-site waterline or because the interpretation of that contract at least presented a question of fact which preluded summary judgment.

It appears from the record that both parties are residential real estate developers. In 1976, defendants contracted to purchase a 96.2 acre tract of land contiguous to the village of Northbrook and west of Sanders Road. They also obtained an option for an additional 18.3 acres east of Sanders Road. After several meetings of the Northbrook plan commission to discuss the annexation of both parcels to the village of Northbrook, an agreement, effective July 12, 1977, was entered into by defendants, the village of Northbrook and the party who had contracted to sell the properties to defendants. The agreement provided in part that the village agreed to "expeditiously review the engineering plans and plats which the Trusts and Developer may hereafter submit for the Property (or for portions thereof) and to reasonably approve said plans and plats or to notify Developer of reasonable proposed revisions or additional requirements." The portion of the agreement which specifically refers to the utilities is as follows:

"5. *Utilities.*

(a) Sewerage service for the Property is to be provided through a connection to the Metropolitan Sanitary District of Greater Chicago ('MSD') interceptor sewer at the intersection of Sanders Road and Walters Road, as depicted on the utilities Plan attached hereto as Exhibit H ('Utilities Plan') which the Village has *tentatively* approved. *The municipal water system*

*shall serve the Property by a connection to the existing main in Sanders Road right-of-way at Sunset Lane and in the Commercial Avenue right-of-way east of the Tri-State Toll Road, more particularly depicted on the Utilities Plan.* With the Trusts and Developer compliance as required by Section 3 hereof, [recapture payments for prior water main improvements by others], the Village agrees that the Trusts and Developer, its successors and assigns, may, for the purpose of serving the Property, connect to such municipal facilities at the above described point or at such other locations as may be convenient to the Trusts and Developer and are reasonably adviseable and proper from an engineering standpoint at the time of the development of the Property, or portions thereof.

(b) The Developer shall obtain all necessary permits for the installation of the utilities system \*\*\*. All extensions of existing sanitary and storm sewers and water mains necessary to serve the Property shall be constructed and installed at the expense of the Trusts and/or Developer, their grantees or assignees, in accordance with the Utilities Plan, *all subject to approval by the Village Engineer.*" (Emphasis added.)

On April 28, 1978, defendants assigned to plaintiff their option to purchase the parcel east of Sanders Road. The relevant portions of that agreement are as follows:

"2. \*\*\* At closing, Assignor [Hoffman] shall be entitled to a proration credit in addition to the Purchase Price equal to the share of 'off-site' costs attributable to the Property which Assignor is required to pay as hereinafter provided in Paragraph 7 hereof.

\* \* \*

7. *Assignor at its sole cost shall have the responsibility of installing off-site storm and sanitary sewer and water lines of sufficient design and capacity to service the Property and the development thereof pursuant to the Preliminary PUD plan as approved by the Village as aforesaid.* Assignee agrees that said utility lines shall be brought to the perimeter of the Property provided, however, that Assignor shall have no obligation to construct or install any sewer or water utility lines within the Property or install any taps, risers or house service lines connecting to any improvements on the Property. At the time of closing, Assignee agrees to execute any and all recapture agreements required by the Village relating to the costs of off-site utility lines and shall assign to Assignor any interest it

may have, either as the owner of the Option Rights under the Contract, or of the Property, to reimbursement for the cost of installation of the off-site utility lines. Assignor shall use its best efforts and shall diligently attempt complete installation prior to closing but in the event that Assignor shall be unable to so complete the installation of the utility lines by such date, Assignor shall complete the installation as soon after closing as possible, weather, and other matters beyond the reasonable control of Assignor, permitting. The proration credit due Assignor at closing pursuant to Paragraph 2 hereof for the cost of utility lines allocated to the Property shall be determined pursuant to Paragraph 5 of the Rider to the Contract. In the event that said utility lines are incomplete at closing, the credit due Assignor shall be the amount of $100,000 provided, however, that Assignor shall, as a reproration, remit to Assignee the amount, if any, by which $100,000 exceeds the actual cost of the utility lines allocated to the Property as determined pursuant to the Contract.

8. Assignor upon closing of this transaction, hereby assumes and agrees to pay, and does hereby indemnify, defend and hold Assignee harmless from and against any and all loss, costs, claims, damages and expense (including reasonable attorney's fees), with respect to the prorata share attributable to the Property of the costs, charges, fees and donations imposed or agreed to be paid by Consolidated under and pursuant to:

(a) The Annexation Agreement ***." (Emphasis added.)

Defendant also sent the following letter, dated August 15, 1978, to plaintiff with respect to certain portions of the assignment agreement:

"Reference is made to that certain Assignment and Option and Agreement dated April 28, 1978 between David Hoffman and Zale Construction Co., an Illinois corporation, pursuant to which you have agreed to purchase and the undersigned has agreed to sell all of its rights, title and interest in and to a certain option to purchase 18.33 acres of vacant land in Northbrook, Illinois.

This letter will confirm that the undersigned will install or cause to be installed off-site storm and sanitary sewer and water lines to the perimeter of the property at no cost to you and you will be under no obligation to pay any 'recapture' or other costs with respect the construction and extension of such lines to the undersigned, Consolidated Realty Company or the Vil-

lage of Northbrook.

This letter will also confirm that the costs of construction, installation or extension of any sewer or water lines within the property shall be your sole responsibility and you shall pay all tap-on fees or other connection charges, if any, required by the Village of Northbrook at any time.

We will also confirm to the Village, if requested, that you have no obligation to reimburse the undersigned or Consolidated Realty Company, for the costs of off-site sewer and water lines."

In September 1978 the transactions were closed, including the sale of the 18.3-acre parcel to plaintiff. Defendants installed an off-site waterline extension which extended north on Sanders Road and west on Forest View Drive. That extension connected to the existing main in the Sanders Road right-of-way. Defendants did not install a water-extension line under the toll road which would have connected to the existing main in the Commercial Avenue right-of-way east of the toll road. Later in 1978, the village indicated to plaintiff that the Commercial Avenue extension was necessary but the village allowed plaintiff to delay actual construction and installation of that water main until 1983. Before the village allowed the continuation of the development, however, it required plaintiff to submit a letter of credit to cover the costs of the installation. In 1981, plaintiff filed a four-count complaint against defendants which sought specific performance, declaratory judgment, rescission, and damages. Plaintiff agreed to defendants' motion to strike the equity count, and the action proceeded in the law division on the damages count. By January 1983 the parties had filed cross-motions for summary judgment and, in May 1983, Judge Quinlan denied both motions. In doing so, he stated that he would be invading the province of the trier of fact if he were to interpret the contract because the actual language of the contract would support either of the parties' interpretations. The cause was assigned to Judge Benjamin Nelson for nonjury trial in May 1985 and, after he unsuccessfully attempted to have the parties reach a settlement, he heard argument on the cross-motions and granted summary judgment for defendants. This appeal followed.

OPINION

■■ ■ Plaintiff first contends that the trial court erred in granting summary judgment for defendants where a genuine issue of material fact existed with respect to the construction and interpretation of the contract. We initially note defendants' argument that plaintiff has

waived his contention for purposes of appeal as a result of plaintiff's argument in the trial court, on the cross-motions for summary judgment, that the documents were not ambiguous. We find this argument to be without merit. Although defendants correctly argue that a new point or theory generally cannot be raised for the first time in a court of review where it could have been raised in the trial court (*Buck v. Alton Memorial Hospital* (1980), 86 Ill. App. 3d 347, 407 N.E.2d 1067), we do not believe plaintiff's contention on appeal constitutes a new point or theory. In *Beverly Bank v. Alsip Bank* (1982), 106 Ill. App. 3d 1012, 436 N.E.2d 598, this court held that the mere filing of cross-motions for summary judgment does not establish the absence of any question of material fact and that the trial court must independently determine whether a genuine issue of material fact exists. A reviewing court has the power to reverse a summary judgment order if the record indicates that a material question of fact exists even where cross-motions for summary judgment were filed in the trial court (*Department of Revenue v. Heartland Investments, Inc.* (1984), 124 Ill. App. 3d 28, 463 N.E.2d 1079, *aff'd* (1985), 106 Ill. 2d 19, 476 N.E.2d 413), and we therefore find that plaintiff was not precluded from argument here concerning the existence of a material question of fact.

■■ ■ With respect to the standard of review, defendants incorrectly argue that the trial court's grant of summary judgment may not be reversed unless there was an abuse of discretion such that plaintiff's right to fundamental justice was violated. Summary judgment is only appropriate where the moving party is entitled to judgment as a matter of law (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c)), and the granting of a motion for summary judgment therefore cannot be a matter of judicial discretion (*Yusuf v. Village of Villa Park* (1983), 120 Ill. App. 3d 533, 458 N.E.2d 575; *Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 453 N.E.2d 1133). Where the trial court has determined the construction of a contract as a matter of law, the reviewing court may independently construe the contract unrestrained by the trial court's judgment. (*Ancraft Products Co. v. Universal Oil Products Co.* (1981), 100 Ill. App. 3d 694, 427 N.E.2d 585.) We note that the cases cited by defendants in support of its argument (*Fearon v. Mobil Joliet Refining Corp.* (1984), 131 Ill. App. 3d 1, 475 N.E.2d 549; *Wil-Shore Motor Sales, Inc. v. Continental Illinois National Bank & Trust Co.* (1984), 130 Ill. App. 3d 167, 474 N.E.2d 376; *Audition Division, Ltd. v. Better Business Bureau of Metropolitan Chicago, Inc.* (1983), 120 Ill. App. 3d 254, 458 N.E.2d 115), cite each other and all basically rely on *Chandler v. Jet Air Freight, Inc.*

(1977), 54 Ill. App. 3d 1005, 370 N.E.2d 95. *Chandler*, however, did not hold that the abuse of discretion standard applied to a grant of summary judgment but rather to a trial court's decision whether to vacate[1] a previous summary judgment order. Here, then, our function is to determine whether the trial court correctly found that no genuine issue of material fact existed and also to determine whether judgment was correctly entered for the moving party as a matter of law. *Coomer v. Chicago & North Western Transportation Co.* (1980), 91 Ill. App. 3d 17, 414 N.E.2d 865.

The primary objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract. (*Ancraft Products Co. v. Universal Oil Products Co.* (1981), 100 Ill. App. 3d 694, 427 N.E.2d 585.) The mere fact that, as here, the parties do not agree on the interpretation does not create an ambiguity. (*Harlem-Irving Realty, Inc. v. Alesi* (1981), 99 Ill. App. 3d 932, 425 N.E.2d 1354.) Whether or not the contract is ambiguous is a question of law (*Ancraft Products Co. v. Universal Oil Products Co.* (1981), 100 Ill. App. 3d 694, 427 N.E.2d 585), and the court may consider extrinsic evidence provisionally for the limited purpose of determining whether an ambiguity exists (*UIDC Management, Inc. v. Sears Roebuck & Co.* (1986), 141 Ill. App. 3d 227, 490 N.E.2d 164).

> "If relevant testimony concerning the circumstances surrounding the signing of a contract is offered, it should generally be heard. *The meaning of words cannot be ascertained in a vacuum.* The function of interpretation of a contract is to ascertain the intention of the parties as manifested by the words they used to evidence their agreement. This cannot normally be done by an isolated inquiry limited to the four corners of a document; it requires that a court attempt to place itself in the same situation as that of the parties at the time of the execution of the contract." (Emphasis added.) (*URS Corp. v. Ash* (1981), 101 Ill. App. 3d 229, 234-35, 427 N.E.2d 1295, 1299-1300, quoting *Ortman v. Stanray Corp.* (7th Cir. 1971), 437 F.2d 231, 234-35.)[2]

---

[1] Although the language in *Fearon* also seems to apply the abuse of discretion standard to the grant of summary judgment, we note that *Fearon* actually was a review of the trial court's decision on vacating summary judgment.

[2] The Seventh Circuit, interpreting Illinois law, recently found that a trial court may consider parol and extrinsic evidence in determining whether a contract is ambiguous, and with other decisions cited *URS Corp. v. Ash* in support thereof. *Sunstream Jet Express, Inc. v. International Air Service Co., Ltd.* (7th Cir. 1984), 734 F.2d 1258.

Where no ambiguity is present, interpretation is a question of law to be determined by use of the contractual language but, where an ambiguity appears, interpretation becomes a question of fact. (*UIDC Management, Inc. v. Sears Roebuck & Co.* (1986), 141 Ill. App. 3d 227, 490 N.E.2d 164.) Various commentators have stated, however, that even where such a question of fact exists, where the meaning is so clear that reasonable men could reach only one conclusion, the court should decide the issue "as it does when the resolution of any question of fact is equally clear." (J. Calamari & J. Perillo, Contracts sec. 3—12, at 124 (2d Ed. 1977); see also Restatement, Contracts (2d) sec. 212, comment e.) Such a statement simply grafts principles of summary judgment law onto the underlying contract law and it appropriately states the law in Illinois. See, *e.g., Metro East Sanitary District v. Village of Sauget* (1985), 131 Ill. App. 3d 653, 475 N.E.2d 1327, 1333.

■ Here, our review of the contract documents—the annexation agreement, the assignment of option, and the clarification letter—discloses that the language in those documents does not support the finding of the trial court. We note that the trial court, in announcing its decision, referred to the utilities plan, preliminary engineering plans regarding certain utilities, while reading the portion of the assignment agreement which referred to the preliminary PUD plan, a separate document which had been approved by the village but made no reference to utilities. The trial court clearly incorrectly believed that the utilities plan established final requirements with respect to off-site water mains and then went onto interpret the contract language regarding the water-main connection in light of this mistaken impression.

Prior to our independent interpretation of the documents, the extrinsic evidence submitted by the parties provides the following context for our understanding of the transaction. The property which was the subject of the annexation agreement included a 96.2-acre parcel west of Sanders Road and the parcel at issue here, an 18.3-acre parcel east of Sanders Road. A memorandum from the Northbrook staff planner, dated July 2, 1976, indicated, with respect to water mains, that "[w]ater service is currently available in the Vorbrook Industrial Subdivision on the east side of the Tollroad and at the intersection of Sunset Lane and Sanders Road just south of the Tollroad. Any extension of water service to the subject property must be looped. This should be accomplished by extending a 12 inch water main north on Sanders Road, as shown on the preliminary engineering and by extending a 12 inch water main from the Vorbrook Industrial Subdivision by auguring under the Tollroad." Almost identical

language regarding the water main was repeated in several memoranda from the staff planner dated August 17, 1976, November 12, 1976, and December 3, 1976.

With regard to the actual contract documents, we believe the following language in the annexation agreement neither requires the interpretation advanced by defendants nor precludes the interpretation argued by plaintiff on appeal:

> "The municipal water system shall serve the property by a connection to the existing main in Sanders Road right-of-way at Sunset Lane and in the Commercial Avenue right-of-way east of the Tri-State Toll Road, more particularly depicted on the Utilities Plan."

Plaintiff suggests that the phrase "more particularly depicted on the Utilities Plan" in the above quote refers to the existing mains, and we agree that the language is more reasonably understood to refer to a connection to two separate mains, one the existing main on Sanders Road and the other the existing main on Commercial Avenue. That suggestion is especially reasonable in the context established by the portions of the staff planner's memoranda which referred to off-site water. Defendants do not deny that the "looped" extension under the toll road is the same water main eventually installed by plaintiff and at issue here. We cannot find that the wording of this provision of the annexation agreement is sufficiently clear or specific to permit a finding, as a matter of law,[3] that there was a duty to install the waterline at issue based solely on this provision, but we nevertheless believe this lack of specificity does not constitute ambiguity when the entire agreement is considered in context. Defendants attempt to use the utilities plan to show that they were not obligated to install the waterline but the utilities plan specifically indicates that the village had only tentatively approved the engineering on the utilities plan at the time of the annexation agreement. Additionally, the agreement was replete with references to its provisions being subject to final approval by the village. More specifically, section five, the portion of the annexation agreement which referred to utilities, provides that "all extensions of existing *** water mains necessary to serve the property shall be construed and installed at the expense of the [Developer], in accordance with the Utilities Plan, all subject to approval by

---

[3]We note in passing that the water main extension required by the village was consistently referred to in the memoranda prepared by the staff planner for the plan commission meetings and that the Northbrook village manager testified at his deposition that the village had never changed its position but instead had always insisted upon installation of the water line at issue here.

the Village Engineer." Section 4, approval of subdivision plats, provides as follows: "(c) The Village agrees to expeditiously review the engineering plans and plats which the Trusts and Developer may hereafter submit for the Property (or for portions thereof) and to reasonably approve said plans and plats or to notify Developer of reasonable proposed revisions or additional requirements." Although defendants in their brief posited that the additional waterline was not "reasonable," and also argued at oral argument that section 4 does not apply to waterlines, we note that the Illinois Municipal Code requires that subdivision plats must be approved by an officer designated by the board before they may be recorded. (Ill. Rev. Stat. 1977, ch. 24, pars. 1—1—2(2)(b), 11—15—1.) The Northbrook plan commission is authorized to prepare a comprehensive plan for development of the village and to implement such plan by ordinances establishing reasonable requirements with respect to water mains, among other things (Ill. Rev. Stat. 1977, ch. 24, par. 11—12—5(1)(b)), and final approval for a subdivision plat is conditioned on compliance with such official map or comprehensive plan (Ill. Rev. Stat. 1977, ch. 24, par. 11—12—8). We therefore do not agree with defendants' argument that section 4 does not apply to water supply.

Although defendants also argue that the village engineer approved phase three of the off-site improvements on August 22, 1978, the testimony of the village manager indicated, and the parties do not deny, that such plans are generally approved in portions. Where the August 22, 1978, plans to which defendants referred did not even show the existing main[4] on Commercial Avenue, we do not believe that approval of this particular document by the village engineer supports defendants' claim that the village was only requiring the line actually installed by defendants. It is also our view that section 4 of the annexation agreement clearly indicated the village had the power, if not the right, to change the engineering requirements until final approval of plaintiff's plat.

We next turn to an examination of the language of the assignment of the option from defendants to plaintiff. It provided that the "[a]ssignor [i.e., Hoffman and Consolidated] at its sole cost shall have the responsibility of installing off-site storm and sanitary sewer and water lines of sufficient design and capacity to service the Property and the

---

[4]Additionally, we note that the document was entitled "Off-Site Improvements for Villas North and Salceda North, Northbrook, Illinois." Plaintiff, in a letter dated somewhat later in 1978, referred to its subdivision as "Sanders Crossing." There is no indication in the record that the August 22, 1978, plans pertained to plaintiff's property.

development thereof pursuant to the Preliminary PUD Plan as approved by the Village as aforesaid."

With respect to the language in the assignment of the option to plaintiff, it appears that the language clearly states that defendants are totally responsible for bringing the off-site water mains to the perimeter of the property. There is language in paragraphs two and seven of the assignment which states that defendants are entitled to a proration credit in addition to the purchase price. The proration credit was for the cost of utility lines allocated to the property and was to be determined pursuant to paragraph five of the rider to the contract. The record does not include a copy of that rider but any amount due defendants based on the cost of the utility lines would seem to conflict with the following contractual language: "Assignor *at its sole* cost shall have the responsibility of installing off-site \*\*\* water lines." (Emphasis added.) The letter dated August 15, 1978, from defendants to plaintiff clarified this by stating that waterlines would be installed at defendants' sole cost and plaintiff would be under no obligation to pay recapture or "other costs" with respect to the extension of the lines to the perimeter of the property nor would plaintiff be obliged to reimburse defendants for such costs.

Defendants do not deny that the assignment agreement provides that, as between the parties to this action, it was defendants' responsibility to install the off-site waterlines required by the village under the annexation agreement. Defendants instead claim that the village could not properly require installation of the waterline at issue under the terms of the annexation agreement or, alternatively, that the village did not actually require plaintiff to install the line and that it volunteered to do so.

We have previously discussed the terms of the annexation agreement and have found that, whatever the effect of the language which described the connections to the existing mains, that same section also referred to the utilities plan, a preliminary engineering plan which was subject to changes requested by, or final approval of, the village. Although defendants attempt to advance a narrow reading of the assignment language "water lines of sufficient design and capacity to service the Property and the development thereof," we cannot agree with its reading this language so as to limit its responsibility to plaintiff. Certainly, the assignment language could not affect defendants' responsibilities to the village under the annexation agreement and defendants, in their letter to plaintiff of August 15, 1978, restated their responsibility to bring all waterlines to the perimeter of plaintiff's property. Defendants argue that the line which they in-

stalled was "of sufficient design and capacity to service the Property" but we believe the approval provisions of the annexation agreement clearly indicate that it is not defendants but the village and its engineers who may decide what is sufficient. We note that defendants now claim that before the annexation agreement was executed, they outright refused to accede to the village's request with respect to the Commercial Avenue waterline installation. There is no record support for this allegation, however, and although the record is not conclusive on this point, it does seem to negate defendants' assertion.[5] Whatever the truth of defendants' statement, however, they did not include appropriate protective language in the annexation agreement and it is only the language of the documents which we now construe. They could have specifically excluded the waterline contemplated at Commercial Avenue but they did not do so. The courts will not rewrite a contract in order to protect the parties against a contingency from which they failed to protect themselves. *Village of Grandview v. City of Springfield* (1984), 122 Ill. App. 3d 794, 461 N.E.2d 1031.

Defendants, having failed to protect themselves[6] in their agreement with the village, also attempt to avoid their responsibility to plaintiff under the terms of the assignment by arguing that the village did not actually require plaintiff to install the line. It is clear from the record, however, that sometime before the final plat approval, either when the plans were being prepared for that final approval or when plaintiff applied for certain building permits, the village required plaintiff to submit a letter of credit for the cost of installing the waterline before it would allow plaintiff to continue the development of its subdivision. Plaintiff submitted affidavits by its president and by the Northbrook village manager, Robert Weidaw, concerning the village's decision to require a letter of credit. Defendants did not file counter-affidavits but instead challenged the village manager's affidavit based on lack of personal knowledge allegedly shown by his deposition. We believe, however, that defendants' challenge of the personal knowledge of the village manager does not affect this particular point where the record shows that it was the vil-

---

[5] The minutes of the Northbrook plan commission meeting held on August 17, 1976, stated that defendant's attorney stated that Mr. Hoffman was "aware of the Staff Planner's comments and recommendations and would move ahead with them in mind." Mr. Hoffman was also present at the meeting and, when questioned by his attorney, he indicated that he felt there was nothing suggested by the testimony of the professionals that could not be done.

[6] We note that the annexation agreement did contain language to prevent the village from changing the R—4 and R—5 zoning.

lage manager who personally corresponded with plaintiff's president in order to resolve the problem with the water main. Defendants may not rely simply on general denials in order to defeat a motion for summary judgment (*Koukoulomatis v. Disco Wheels, Inc.* (1984), 127 Ill. App. 3d 95, 468 N.E.2d 477), and we note here that defendants' attorney indicated during the deposition of the village manager that defendants did have a copy of the letter of credit which the village required of plaintiff. In the light of our interpretation of the contract, it appears to us that defendants' obligation to plaintiff depended on whether the village required installation of the waterline sometime before the final plat approval. Defendants did not counter plaintiff's showing that the village did require such installation. We therefore find that defendants were obligated under the terms of the assignment and the annexation agreement to install the waterline.

For the foregoing reasons, we reverse the order of the trial court granting summary judgment for defendants and remand for the entry of an order granting summary judgment for plaintiff.

Reversed and remanded.

PINCHAM and MURRAY, JJ., concur.