R.T. HEPWORTH COMPANY, Plaintiff,

v.

DEPENDABLE INSURANCE
COMPANY, INC., Third–
Party Plaintiff/Appellant,

v.

AEGON USA, INC., Third–Party
Defendant/Appellee.

No. 92–2404.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 27, 1993.

Decided June 24, 1993.

**316**

Fred Louis, III, Olson, Grabill, Hoffman & Louis, Chicago, IL, for Plaintiff.·

John H. Mathias, Jenner & Block, Chicago, IL, Michael G. Tanner (argued), John T. Rogerson, III, Kirschner, Main, Petrie, Graham & Tanner, Jacksonville, FL, for plaintiff/appellant.

David J. Novotny (argued), J. Robert Geiman, William A. Chittenden, III, Douglas Varga, Barry C. Taylor, Peterson & Ross, Chicago, IL, for defendant/appellee.

Before CUMMINGS and KANNE, Circuit Judges, and MIHM, Chief District Judge.*

CUMMINGS, Circuit Judge.

An insurance company, having made a bad deal for itself, now seeks to squirm free of the terms of its contract by claiming that they are ambiguous. Dependable Insurance Co. ("Dependable") wants the return of commissions it paid to R.T. Hepworth Co. ("Hepworth"), a managing general agent for insurance carriers, and is suing Aegon, USA ("Aegon"), the successor in interest to the firm that guaranteed Hepworth's debts.[1] Under an agency agreement signed in mid–1981, Hepworth began finding banks for Dependable to do business with. The banks loaned money to customers—usually to buy cars—and the cars themselves served as collateral in which the banks retained a security interest. The customers were required to show proof that the cars were insured. If a customer did not show proof of coverage even after a written request, the bank bought an insurance policy from Dependable without the customer's knowledge or approval and added the cost of the premium to the principal of the loan. Hepworth was responsible for collecting premiums and sending the money to Dependable, which in turn paid a commission to Hepworth based on the volume of business it procured. Hepworth received as commission an extraordinary sum: at least 82 percent and sometimes as much as 90 percent of the premiums.

This kind of insurance is called "collateral protection" because, simply enough, it is designed to protect the collateral. The bank is trying to keep from getting burned when a debtor wrecks a car and ceases to make monthly payments; at that point the bank has lost all leverage over the customer because what it would repossess is now valuable only as scrap metal. A customer was not necessarily saddled with unsolicited coverage, however, because state laws dictate that if he could show proof of other insurance during the period of the loan, the insurance policy was canceled, Dependable had to send the money back to the bank (which gave the

---

\* The Honorable Michael M. Mihm, Chief Judge of the Central District of Illinois, is sitting by designation.

1. The procedural posture of this case is utterly confusing. Hepworth initiated the suit against Dependable and its subsidiary, Richmond I. Barge & Associates, Inc., claiming that Dependable was retaining commissions it owed to Hepworth on canceled policies. Dependable filed a counterclaim against Hepworth seeking the return of those commissions it had paid. Then Dependable sued Aegon as a third-party defendant; Aegon is the successor in interest to Life

Investors, Inc., a firm that guaranteed Hepworth's obligations to Dependable. Life Investors actually purchased Hepworth in 1980 from its then principal, Richard Hepworth, but sold Hepworth back to its namesake in 1984. Aegon in turn sued Hepworth for indemnification, but the Hepworth Co. went bankrupt in 1991 and its claims were voluntarily dismissed with prejudice; Richard Hepworth died in 1986. Aegon and Dependable moved for summary judgment against one another. The district court resolved all disputes between the parties in Aegon's favor, and Dependable now appeals.

customer a credit), and Hepworth had to return its commission—or so Dependable now claims. The district court found otherwise. According to Judge Holderman, under the agency agreement between the parties Hepworth did not have to return commissions even on policies that had been terminated because the customer showed proof of other insurance. This, then, is the heart of the dispute: whether the agent keeps the commissions it has earned, or whether it must refund the money to the insurance company if the policies are canceled, no matter how many years later the cancellation occurs.

■ The agreement signed by Hepworth and Dependable on July 31, 1981 says flatly: "Agent shall not be obligated to return any commissions received * * *." For purposes of clarity, we will refer to this provision in the contract as the "retention clause." The only exception to the retention clause is for "error[s] in calculations of reserves for losses outstanding as at the time of an accounting." Since there is no allegation that there has been any such error here, the contract's straightforward language giving the agent power to retain commissions would seem to doom any attempt by Dependable to recover the commissions it paid to Hepworth. Indeed, the district court's conclusion was based on Dependable's explicit contractual waiver of rights in paid commissions.

The insurance company attempts to overcome the retention clause in two ways. First, it argues that a second clause in the contract—one describing how commissions are to be calculated—expressly directs that Hepworth compensate Dependable for previously paid commissions on terminated policies. Specifically, the formula for calculating commissions on new insurance contracts contemplates subtracting from the total any previously paid commission on a canceled policy. Thus Hepworth did in essence reimburse Dependable for voided policies, not by returning commissions as a general matter but by having Dependable pay it less in current commissions. According to Dependable, this formula for computing commissions cannot peacefully co-exist with the contract's retention clause. Taken together, these provisions render the contract ambiguous and a

jury should have been permitted to decipher its real meaning; hence summary judgment was inappropriate. Second, Dependable argues that the way the parties performed under the contract shows that they never intended Hepworth to retain commissions. Dependable again points to Hepworth's acquiescence over the eight years of the contract in accepting lower commissions to compensate for canceled policies, and it notes that on four occasions Hepworth actually returned commissions at the insurance company's request. Dependable takes this course of performance to suggest that, even if the contract seems to say that the agent need not return commissions, it can't really mean that; Dependable's basic point is that Hepworth is required to return commissions because it has done so all along. In light of this extrinsic evidence, according to Dependable, the contract is ambiguous and the district court erred in granting summary judgment. Because these arguments are ultimately unpersuasive, we hold that Dependable cannot evade the contract's explicit directive and therefore affirm the district court.

■ Interestingly, Dependable has not argued that the parties modified their written contract by oral agreement. Oral modifications are permitted in Illinois, even if the contract contains a provision banning oral modifications (this one doesn't). *Duncan v. Cannon,* 561 N.E.2d 1147, 1152, 149 Ill.Dec. 451, 456, 204 Ill.App.3d 160, 168 (1st Dist. 1990) (but the waiver must be proved by clear and convincing evidence). Dependable might well have made a modification claim here: the parties had a meeting of the minds at the time they signed the agreement in 1981 that the agent could keep commissions but, as their subsequent behavior shows, they later agreed that Hepworth would reimburse Dependable for canceled policies. Yet Dependable has not demonstrated reliance on a modified contract as is required under *Nelson v. Estes,* 507 N.E.2d 530, 533, 107 Ill. Dec. 617, 621, 154 Ill.App.3d 937, 941 (2d Dist.1987), and in any event, has waived the modification argument by not raising it before this Court or the district court. *Hayes*

v. *Otis Elevator Co.*, 946 F.2d 1272, 1276 (7th Cir.1991).

By focusing on the original agreement then, Dependable is left to argue either that the parties did not come to a coherent understanding or that their original meeting of the minds is not accurately reflected in the written agreement—in other words, that the contract is ambiguous. *Perlman v. First Nat. Bank of Chicago*, 305 N.E.2d 236, 15 Ill.App.3d 784, 794 (1st Dist.1973), appeal dismissed, 331 N.E.2d 65, 60 Ill.2d 529 (1975). A contract may be ambiguous in one of two ways: either it is internally inconsistent or unclear (this is internal ambiguity), or it is ambiguous in light of extrinsic evidence (this is external ambiguity). In the latter case, even though the contract appears to be complete and understandable to someone who can read English but does not know the background of the negotiations, further inquiry—that is, inquiry beyond merely studying the words of the document—reveals a genuine dispute about the contract's meaning. *Agfa–Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1521 (7th Cir.1989). Illinois has largely rejected the traditional rule, sometimes called the "four corners rule," which holds that if a contract is clear "on its face," no other evidence may be introduced to contradict its terms. *Federal Deposit Ins. Corp. v. W.R. Grace & Co.*, 877 F.2d 614, 620–621 (7th Cir.1989), certiorari denied, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (quoting *Stamatakis Indus., Inc. v. King*, 520 N.E.2d 770, 775, 117 Ill.Dec. 419, 424, 165 Ill.App.3d 879, 887 (1st Dist.1987); *Zale Construction Co. v. Hoffman*, 494 N.E.2d 830, 834, 98 Ill.Dec. 708, 712, 145 Ill.App.3d 235, 241 (1st Dist.1986); *UIDC Management, Inc. v. Sears Roebuck & Co.*, 490 N.E.2d 164, 166, 95 Ill.Dec. 691, 93, 141 Ill.App.3d 227, 230 (1st Dist.1986); *Sunstream Jet Express, Inc. v. International Air Serv. Co.*, 734 F.2d 1258, 1268 (7th Cir.1984); *Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir.1987) (per curiam)). Thus Illinois courts may look to extrinsic evidence in hope of discovering the principals' genuine intent, and parties can no longer be certain that they will be stuck with the language of the agreements they sign, no matter their actual intent.

Still, extrinsic evidence cannot be used to create a conflict completely apart from the contract itself. See, *e.g.*, 810 ILCS 5/2–208(2) (under the Uniform Commercial Code, express terms and course of performance and usage of trade should be harmonized, but where such construction is unreasonable, express terms control). As we recently said, "there must be either contractual language on which to hang the label of ambiguous or some yawning void * * * that cries out for an implied term. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them." *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir.1993) (en banc). The determination as to a contract's ambiguity is a question of law reserved to the judge rather than the jury. *Whiting Stoker Co. v. Chicago Stoker Corp.*, 171 F.2d 248, 250 (7th Cir.1948), certiorari denied, 337 U.S. 915, 69 S.Ct. 1155, 93 L.Ed. 1725 (1949).

Dependable characterizes the ambiguity in its contract with Hepworth as external rather than internal, but its specific arguments veer back and forth between the two. At one point the insurance carrier contends that the agreement is internally inconsistent because the formula conflicts with the retention clause. Elsewhere Dependable concedes that the contract is clear on its face but is ambiguous in light of the course of performance and custom in the industry. In any event, we agree with Dependable that the district court should have considered extrinsic evidence—specifically, affidavits from the principals discussing the course of performance, *Marathon Plastics, Inc. v. International Ins. Co.*, 514 N.E.2d 479, 486, 112 Ill.Dec. 816, 828, 161 Ill.App.3d 452, 464 (4th Dist.1987), appeal denied, 522 N.E.2d 1246, 119 Ill.Dec. 387, 119 Ill.2d 559 (1988), and industry custom and practice, *Carondelet Sav. & Loan Ass'n v. Citizens Sav. & Loan Ass'n*, 604 F.2d 464, 470 (7th Cir.1979)—which purported to show that Hepworth was not only obligated to return commissions on canceled policies, but had done so over the course of the contract. It is not clear from Judge Holderman's short disposition of the summary judgment motions—his reasons were typed on the back of the minute order

granting judgment to Aegon—whether he considered Dependable's affidavits.

Nevertheless, the district court's ultimate conclusion that the agency agreement is not ambiguous is correct, even considering the extrinsic evidence. As noted, Dependable's position is that the formula for calculating commissions, under which Hepworth acquiesced in allowing the carrier to reduce current commissions to compensate for voided policies, is necessarily at odds with the retention clause giving the agent the power to keep any commissions received. The thrust of Dependable's argument is that there is no difference between commissions received and returned later and commissions withheld in the first instance. If this proposition is correct, then the contract is internally inconsistent because, on the one hand, it gives Hepworth an unassailable right to keep commissions and, on the other, it instructs Dependable to retain commissions to compensate for rescinded policies. The insurance company would resolve the apparent contradiction by re-interpreting the word "commission." Thus the retention clause, which says "agent shall not be obligated to return any commissions received * * *" should actually be read to mean that "agent shall not be obligated to return any [*earned*] commissions received." A commission is not earned, in Dependable's view, if the policy on which it is based is later canceled. Rather than sending the agent commissions on new insurance policies, then, Dependable sent Hepworth a kind of advance or provisional payment which would not vest, or become unalterably the property of the agent, until the end of the loan's term, at which time there was no longer any danger that the customer would cancel the policy by providing proof of other insurance. Yet there is not even a hint in the contract itself that payments to the agent are not commissions. Indeed, the formula refers to the sum Dependable was required to pay Hepworth as "commission." Dependable's argument about "earned commissions" is clever, but there is no suggestion in the agreement that the money paid to Hepworth was in any way contingent on some later event (or, to be exact, a later non-event).

Also, we are not convinced that there is a genuine contradiction between the formula and the retention clause. Dependable is correct, in the abstract at least, that there would seem to be no functional distinction between subtracting money from amounts it paid to the agent and having the agent reimburse it directly. If a seller and buyer have an ongoing relationship and for some reason—say, a canceled order—seller owes buyer money, it does not matter whether seller pays its debt by having buyer reduce future payments or whether the parties go through the formality of having the seller send buyer a check which, of course, buyer could apply toward his next purchase. However, the contract makes this precise distinction when it emphasizes that "agent shall not be obligated to return any commissions *received*" (emphasis added). Thus the contract itself pinpoints the transfer of money as the key event cutting off Dependable's right to commissions from canceled policies.

At first glance such a distinction may seem nonsensical; why should the parties treat commissions received differently from commissions withheld? The answer is probably in the hit-and-miss nature of the collateral protection industry. Since most people who take out car loans find their own insurance, and because a customer may void the policy by showing proof of coverage at any time during the life of the loan, the scheme's success rate is probably quite low; an insurance contract carried to full term is no doubt a boon to the carrier. That a successful contract produces what amounts to a windfall may be partly reflected in the high commissions paid by the insurance company to the agent. But if (as Dependable would have us believe) the agent had to wait three, four, five years or longer before it could be sure that it had actually "earned" its commissions—before its right to the commissions vested—then the agency business would be tenuous indeed. Agents would be forced to retain much of their capital in what would in essence be escrow accounts. The effect of the retention clause, then, is to create an (albeit) arbitrary point at which the agent's liability for canceled policies is extinguished: the transfer of cash. The benefit to the agent is obvious. First, although the agent

agrees to lower commissions generally to compensate for voided contracts, it gives the agent the security of knowing that once cash is in hand, it will not have to refund any money. This no doubt eases long-term planning because the agent doesn't have to maintain a contingency fund for policies which are belatedly canceled. Second, the agent has the advantage of knowing that if its business diminishes and few new contracts are being written, its liability for terminated policies can never be greater than the amount it is owed in current commissions. This must be a great luxury in such an unpredictable business!

Dependable argues that it is both unfair and commercially impractical that it would have to bear the risk for canceled policies when the agent receives more than 80 percent of the premiums in commission. The larger insurance company though, with its deeper pockets, is precisely the party more likely to be chosen by the principals to bear the risk. Also, the risk may not be that great because most cancellations probably come at the outset, shortly after customers realize that an insurance premium has been added to their loan. In short, we can think of several reasons why the parties might have chosen to treat commissions that have been received by the agent differently than commissions withheld. More to the point, the contract itself dictates such different treatment. Because of its emphasis on the word "received," we hold that the agreement's formula does not conflict with the retention clause.

On four occasions, however, Hepworth actually returned money to the insurance carrier at its request, apparently to compensate for voided policies. These instances all occurred after Mr. Hepworth died. Mrs. Hepworth was running the company then, and Aegon claims she complied with Dependable's requests without understanding her rights under the contract. We agree with Dependable that this is not a particularly satisfactory explanation. Nevertheless, this course of performance does not create an ambiguity in the contract because the agreement itself leaves room for the agent to return commissions if it sees fit. Returning

again to the language of the document: "Agent shall not be *obligated* to return any commissions received" (emphasis added). The word "obligated" clearly implies that Hepworth could, if it chose, decide to return commissions to Dependable without either breaching the agreement or modifying its terms. "Not obligated" may at first blush seem like a throw-away phrase. Actually, it creates a substantive right under the contract to choose to engage in certain behavior without forming an obligation to continue doing so. For example, a rental agreement that says the landlord is not obligated to cut the grass would allow the landlord to do so on whim every week for five years. When on the first weekend of the sixth year he decided to stay home and watch a baseball game instead, the tenant could not complain. If on the other hand the rental agreement had been silent about lawn care, and the landlord kept the grass trimmed every week for five years, the tenant would have a compelling argument that the service was included in his rent. Here too, the words "not obligated" gave the agent the luxury of returning commissions (in this instance on rare occasions) without creating an obligation to do so at the carrier's request.

Finally, the contract that Dependable now claims is ambiguous was written by none other than Dependable; all of the key terms, including the provision to which Dependable objects, were furnished by the insurance company. As we have said before, "[c]ourts do not sit to relieve contract parties of their improvident commitments, except within the limited dispensation conferred by the doctrine of impossibility, not here invoked." *Bidlack, supra,* at 609. The contract may be unfavorable to Dependable, it may even make some commercially questionable distinctions, but it is not ambiguous. For the foregoing reasons, the judgment of the district court is affirmed.